**Case No. 25-2618**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

**SCOTT CLAUSON, BRIAN SJOTHUN, JAMES BARRINGER, STEVEN FURST, MICHAEL TODD, GEOFFREY KIRKPATRICK, RANDAL JEWELL, and TREVOR ARNOLD,**

Defendants-Appellants

v.

**APRIL FONSECA, aka APRIL EHRLICH,**

Plaintiff-Appellee

Honorable Mark D. Clarke
United States District Judge
Case No. 1:22-cv-01416-CL

---

**DEFENDANTS-APPELLANTS' OPENING BRIEF**

---

Andrea D. Coit, OSB No. 002640
acoit@eugenelaw.com
Emily M. Perkins, OSB No. 222553
eperkins@eugenelaw.com
Hutchinson Cox
940 Willamette Street, Suite 400
PO Box 10886
Eugene, OR 97440
Telephone: (541) 686-9160

Of Attorneys for Defendants-Appellants

i

# TABLE OF CONTENTS

**<u>Page(s)</u>**

I.     INTRODUCTION ................................................................1

II.    JURISDICTIONAL STATEMENT ......................................3

III.   ISSUE PRESENTED ..........................................................4

        1.    Did the district court apply the wrong legal analysis to its factual findings when evaluating whether a constitutional violation occurred?........................................................4

        2.    Did the district court err in denying qualified immunity to each of the Individual Defendants? ............................................4

IV.   STATEMENT OF THE CASE .......................................4

    A.    Statement of Facts .................................................4

    B.    Actions of Individual Defendants ...........................10

        1.    Brian Sjothun. ...........................................10

        2.    Scott Clauson ...........................................10

        3.    Randal Jewell ...........................................11

        4.    Trevor Arnold ...........................................11

        5.    Steven Furst..............................................11

        6.    James Barringer and Michael Todd .........................12

        7.    Geoffrey Kirkpatrick...................................12

    C.    Plaintiff's Claims.................................................12

    D.    Procedural History................................................13

V.    SUMMARY OF THE ARGUMENT ................................15

VI.   STANDARD OF REVIEW ................................................17

VII.  LEGAL ARGUMENT................................................18

    A.    Law on Qualified Immunity ...............................18

B.  Plaintiff's First Amendment Claim ...................................................19

1.  Established Facts in the Summary Judgment Record
    Material to Ms. Fonseca's First Amendment Right.................20

2.  District Court's Application of the First Amendment's
    Prior Restraint on Speech Analysis ...........................................21

3.  Distinction Between the Right to Freedom of Speech and
    the Right to Access Information .................................................23

4.  Denial of Right of Access Allowed When Reasonably
    Related to a Legitimate Government Interest ...........................25

5.  District Court Erred in Finding the Individual Defendants'
    Conduct Violated a Clearly Established Right ........................30

C.  Plaintiff's Fourth Amendment Claim...............................................36

1.  Direct Action Against Defendants Sjothun, Claussen,
    Arnold, Jewell and Kirkpatrick.................................................37

2.  Direct Action Against Defendants Furst, Todd and
    Barringer ......................................................................................38

VIII.  CONCLUSION.............................................................................................40

STATEMENT OF RELATED CASES ...............................................................41

CERTIFICATE OF FILING AND SERVICE .......................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Broadcasting Companies v. Cuomo*,
   570 F.2d 1080, 1083 (2d Cir. 1977) ..................................................26

*Anderson v. Creighton*,
   483 U.S. 635, 639 (1987) ...............................................................18

*Beck v. Ohio,*
   379 U.S. 89, 91 (1964) ...................................................................38

*Branzburg v. Hayes*,
   408 U.S. 665, 682 (1972) ......................................................... 23, 24

*Butz v. Economou*,
   438 U.S. 478, 507 (1978) ...............................................................30

*California First Amend. Coal. v. Calderon*,
   150 F.3d 976, 981 (9th Cir. 1998) ..................................................24

*D'Amario v. Providence Civic Ctr. Auth.*,
   639 F. Supp. 1538, 1543 n. 4 (D.R.I. 1986), *aff'd without opinion*, 815
   F.2d 692 (1st Cir. 1987) ................................................................26

*Davis v. United States*,
   564 U.S. 229, 236 (2011) ...............................................................38

*Dittman v. California*,
   191 F.3d 1020, 1027 (9th Cir. 1999) ..............................................34

*Evers v. County of Custer*,
   745 F.2d 1196, 1203 (9th Cir. 1984) ..............................................33

*Fournier v. Sebelius*,
   718 F.3d 1110, 1117 (9th Cir. 2013) (constitutional rulings) ...........17

*Groh v. Ramirez*,
   540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting).....................30

*Grossman v. City of Portland*,
   33 F.3d 1200 (9th Cir. 1994) ...................................................... 32, 34

*Harlow v. Fitzgerald*,
   457 U.S. 800, 818 (1982)...............................................................18

*Hope v. Pelzer*,
   536 U.S. 730, 739 (2002)...............................................................30

iv

*Houchins v. KQED, Inc.*,
   438 U.S. 1 (1978)...........................................................................24

*Hunter v. Bryant*,
   502 U.S. 224, 229 (1991).............................................................18

*In re Application of The Herald Co.*,
   734 F.2d 93, 100 (2d Cir. 1984) .................................................23

*Jessop v. City of Fresno*,
   936 F.3d 937, 940 (9th Cir. 2019) ..............................................19

*Jones v. Williams,*
   297 F.3d 930, 934 (9th Cir. 2002) ..............................................19

*Lal v. California,*
   746 F.3d 1112, 1116 (9th Cir. 2014) ..........................................19

*Malachowski v. City of Keene,*
   787 F.2d 704, 713-14 (1st Cir.), *cert. denied,* 479 U.S. 828, 93 L. Ed. 2d
   56, 107 S. Ct. 107 (1986)..............................................................33

*Meyers v. City of New* York,
   812 F. App'x 11 (2d Cir. 2020) ...................................................28

*Mitchell v. Forsyth*,
   472 U.S. 511, 530 (1985)................................................................3

*Pearson v. Callahan*,
   555 U.S. 223, 236 (2009)..............................................................19

*Pell v. Procunier*,
   417 U.S. 817, 834 (1974)..............................................................24

*Pierson v. Ray*,
   386 U.S. 547, 555 (1967)..............................................................32

*Prison Legal News v. Lehman,*
   397 F.3d 692, 698 (9th Cir. 2005) (qualified immunity)...................17

*Richardson v. McKnight*,
   521 U.S. 399, 408 (1997)..............................................................18

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555, 586 n.2 (1980).......................................................23

*Saved Magazine v. Spokane Police Dept.*,
   19 F.4th 1193 (9th Cir. 2021) .......................................... 31, 32, 34

*Thomas v. City of Talent*,
   271 Fed. Appx. 677, 678 (9th Cir. 2008).....................................33

v

*Zemel v. Rusk*,
   381 U.S. 1, 17, (1965)........................................................................23

**Statutes**

28 U.S.C. § 1291 ..............................................................................3

28 U.S.C. § 1331 ..............................................................................3

42 U.S.C. § 1983................................................... 3, 12, 21, 33, 36, 40

## I.    INTRODUCTION

This appeal challenges the legal correctness of the district court's denial of qualified immunity to public employees acting pursuant to their official responsibilities for the City of Medford, Oregon (the "City").

In September 2020, a large group of people took over one of the City's downtown municipal parks, setting up a tent community that occupied the entire park, making it unusable to the majority of the City's residents.  As a result of this occupation, the park was littered with trash and drug paraphernalia and its public facilities were vandalized.  The park occupiers were aggressive to others who entered the park and were openly engaged in drug use.

When the City made the decision to disperse the occupation and return the park to its intended use, it chose to do so in the safest manner possible, for the protection of not only the City employees, including law enforcement officers facilitating the clearance and cleanup, but also for the occupiers themselves.  To that end, Medford's City Manager issued a temporary closure order pursuant to his authority under the Medford City Charter, closing the park for the period of time needed for City employees and social service organizations to work together to assist the occupiers in relocating to more suitable accommodations.

The City Manager's closure order was implemented by City law enforcement through an operation plan.  Under that operation plan, all members of

the general public were excluded from the park during its closure other than an identified list of people actively assisting in the removal and cleanup operation.

Plaintiff April Fonseca arrived at the park when the City Manager's closure order was in effect. As found by the district court, she was not intending to assist in either the relocation of the campers or the cleaning of the park. As such, the closure order excluded her from the park. When City law enforcement officers asked Ms. Fonseca to leave the closed park, Ms. Fonseca refused. She refused to cover the event from the media staging area or the sidewalk (as other journalists were doing), refused to leave the park, and refused to engage further with the officer on the matter.

Ms. Fonseca's refusal to follow the police officers' lawful order for her to leave the closed park gave the officers probable cause to arrest Ms. Fonseca for trespass, which they did.

Ms. Fonseca thereafter brought this lawsuit, alleging among other claims, violation of her First and Fourth Amendment rights.

The City Manager and the law enforcement officers were each entitled to qualified immunity against Ms. Fonseca's claims that they violated her constitutional rights for two reasons. First, Ms. Fonseca's right to access the closed park to observe and record a law enforcement operation did not outweigh the City's legitimate interest served through the closure. As such, no constitutional violation occurred. Second, neither the City Manager nor the City's law

enforcement officers had reason to believe that their actions vis à vis Ms. Fonseca were unconstitutional. None were on notice that the City's charter provision allowing the City Manager to close a city park to achieve a legitimate governmental interest was a restriction on protected speech that, when applied to a person claiming to be a reporter, violated that person's constitutional rights.

## II.   JURISDICTIONAL STATEMENT

Plaintiff-Appellee April Fonseca invoked the district court's subject matter jurisdiction under 28 U.S.C. § 1331 by asserting claims against the City of Medford defendants arising under 42 U.S.C. § 1983. On June 28, 2024, the City of Medford individual Defendants-Appellants (Individual Defendants) filed motions for summary judgment, seeking qualified immunity on all of Plaintiff's federal claims as a matter of law. ER-83-108. The district court issued an appealable order in this case on April 2, 2025, denying the Individual Defendants' claims for qualified immunity as a matter of law in its Opinion and Order. ER-3-25. Defendants-Appellants filed a timely notice of appeal on April 22, 2025. ER-153-155.

This Court has jurisdiction to review the district court's denial of qualified immunity under 28 U.S.C § 1291; specifically, the collateral order doctrine, because this appeal of the denial of qualified immunity raises only legal questions. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

4

## III.   ISSUE PRESENTED

1.   Did the district court apply the wrong legal analysis to its factual findings when evaluating whether a constitutional violation occurred?

2.   Did the district court err in denying qualified immunity to each of the Individual Defendants?

## IV.   STATEMENT OF THE CASE

### A.   STATEMENT OF FACTS[1]

In September 2020, a relatively large number of people were occupying Hawthorne Park, a municipal park in the heart of downtown Medford, Oregon, in a makeshift tent city. Several of the occupiers were believed by the City to be from out of the area, being called to the occupation through social media. ER-111, 118. The encampment grew to an approximate of 200 people and the City received an increasing number of complaints from concerned citizens. Reports were received by the City of open drug use, property destruction, open human waste and violence in the park. ER-111, 122.

---

[1]The Individual Defendants do not challenge the district court's factual findings, only the legal conclusions based on those findings. The district court's findings inherently are a product of the summary judgment standard, in which disputed facts are characterized in the light most favorable to the non-moving party. As such, the facts stated herein and relied on by the Individual Defendants for their arguments are either those found by the district court in its opinion and, when not mentioned by the district court in its opinion, contextual undisputed facts from Defendants' submissions to the summary judgment record. Nothing in this brief should be interpreted as substantive agreement with those findings for any purpose other than the technical standard applicable to this appellate proceeding.

By the time the City decided it needed to close the park and remove the illegal campsites, an estimated 100 complaints regarding the park had been received. ER-111. The summary judgment record established that calls for police response to the park increased from 29 during the period of August 10, 2020, through August 21, 2020, to 73 for the period of September 10, 2020, through September 21, 2020. ER-111, 122.

By September 14, 2020, the Medford City Council, the Medford Chief of Police, Scott Clauson, and the Medford City Manager, Brian Sjothun, had concluded that Hawthorne Park was no longer able to be used for its intended purpose and posed a safety risk to the community. They decided that the people illegally camping in Hawthorne Park and their campsites needed to be removed so the park could be returned to its intended use. ER-6.

In September 2020, the City of Medford's City Charter, Section 18(3)(e) provided that: "[e]xcept as provided in Section 21 with respect to the jurisdiction of the Board of Water Commissioners, the city manager shall supervise the operation of all public utilities owned and operated by the city and shall have general supervision over all city property." ER-89. Pursuant to his authority to supervise City property, on September 18, 2020, City Manager Sjothun issued an order for the closure of Hawthorne Park for 48 hours commencing on September 21, 2020, at 8:00 a.m. ER-6, 112, 120, 146. City Manager Sjothun's

purpose in closing the park was to facilitate the removal of an unauthorized urban campground that was causing drug use, fighting, destruction of public property, garbage and human waste in the park. ER-121.

In September 2020, Defendant Trevor Arnold was the Lieutenant of the Community Engagement Division for the City of Medford Police Department. ER-111, 112. The Community Engagement Division is a section of the police department that covers the department's code enforcement division, livability team, the school resource program, the community service officer program, traffic, volunteers and cultural outreach. ER-6. In this position, Defendant Arnold was required to implement the City Manager's closure order and accomplish the City's objective of removing the illegal campers from Hawthorne Park and making it safe and available for the City's Parks Department to clean. ER-6.

On September 18, 2020, an Operation Plan was created to be used by City officials as the tool for implementation of the City Manager's closure order. ER-6, 122, 123. Defendant Arnold was identified in the Operation Plan as the Incident Commander, making it his official duty to ensure the park was closed as directed by the City Manager and the urban campground was removed from the public park. *Id*.

A formal notice to all persons illegally camping in Hawthorne Park to vacate the park was posted before 8:00 a.m. on September 21, 2020, alerting the campers

at Hawthorne Park that they had 24 hours to vacate Hawthorne Park or face arrest for trespass. ER-7, 112.

Also on September 21, 2020, the Livability Team coordinated with local outreach groups to conduct a resource fair at Hawthorne Park, with the goal being to connect as many of the people camping at the park with available resources for shelter and other needs. Participating groups included Jackson County Mental Health, Rogue Retreat, Men's and Women's Gospel Mission, and La Clinica. The campers were informed of available shelters throughout the Rogue Valley, and transportation to those shelters was offered and utilized by individuals at the park. At the end of the day on September 21, 2020, 34 people had connected with Rogue Retreat (a local low-barrier homeless shelter operator) and two people were taken to the Expo (which was providing emergency shelter to individuals displaced by a recent wildfire). A total of 36 additional people who were connected with and eligible to go to Rogue Retreat did not accept the service. ER-111, 112, 124.

At the conclusion of the day on September 21, 2020, the City again reiterated that the current health and sanitary conditions of Hawthorne Park required immediate closure. Approximately 75 people still remained in Hawthorne Park at that time, and they were reminded that, pursuant to the notice posted, the park was closed and they had to vacate. ER-112, 124.

8

On September 22, 2020, the City of Medford Police Department arrived at Hawthorne Park around 8:00 a.m. and again announced to the campers and others in the park that Hawthorne Park was closed. ER-114, 147. Campers actively engaging in clean-up and removal of their belongings and those assisting campers in that clean-up and removal were permitted to remain in the park for the time required to accomplish the objective of cleaning up and moving out. Representatives of the City of Medford (including police officers and probation officers) and representatives of resource agencies engaged in assisting the campers in their transition to alternative locations were also permitted to remain in the park if they were assisting in the clean-up operation. *Id*.

In accordance with City Policy No. 146 (News Media Policy), on September 22, 2020, members of the media wanting to report on the activity taking place in Hawthorne Park were provided designated access to a Medford official for purposes of gathering information and asking questions about the relocation and cleanup effort. ER-7, 114, 115, 125. Members of the media were given priority to locate themselves and their equipment in a media staging area for the duration of the closure if they chose. ER-114, 115. The media staging area was located just outside the perimeter of the park, on a raised portion of the walkway close to the entrance. Defendant Arnold instructed the Medford police officers who encountered any representatives from the media during the removal and clean-up

effort to let them know that they could set up in the media staging area and he would be available at that location to answer questions. ER-7, 114, 115.

Plaintiff April Fonseca entered Hawthorne Park early in the morning of September 22, 2020, to speak with campers and gather information about the removal process. ER-8, 147. Plaintiff was not a camper in the park, she was not assisting campers in their clean-up and removal of personal items from the park, and she was not a representative of a resource agency. *Id.*

City of Medford police officer Defendant Steven Furst informed Plaintiff that Hawthorne Park was closed, that she was trespassing, and that she was required to leave the park. ER-148. Plaintiff refused Defendant Furst's instruction to leave Hawthorne Park. She did not raise any concerns about the media staging area at the time or seek any other accommodation; she just shook her head repeatedly and said "no" and that she did not have to leave because she was a reporter. ER-8, 148.

Defendant Furst informed Ms. Fonseca that she was being arrested for trespassing. ER-8, 115, 116, 135. Plaintiff struggled with Defendants Furst, Todd and Barringer as they tried to secure her hands into handcuffs. Plaintiff yelled at the officers and demanded to be released, stating that they could not arrest her because she was a reporter. ER-132, 133, 134, 135, 148. Defendant Furst ultimately secured Plaintiff's hands into handcuffs, and she was thereafter

transported and lodged into the Jackson County jail on charges of trespassing, resisting arrest and interfering with a police officer. ER-136, 148.

## B. ACTIONS OF INDIVIDUAL DEFENDANTS

### 1. Brian Sjothun.

The district court found that "on September 18, 2020, City Manager Sjothun issued an order pursuant to City of Medford City Charter § 18(3)(e) for the closure of Hawthorne Park in Medford, Oregon for 48 hours, commencing on September 21, 2020, at 8:00 a.m." ER-6. No facts in the summary judgment record suggest that City Manager Sjothun was in Hawthorne Park on September 22, 2020, or that he had any interaction with Plaintiff.

### 2. Scott Clauson

Plaintiff alleged in her Complaint that Defendant Clauson was the City's Police Chief and that he sent an email to other City officials on September 18, 2020, "regarding a plan to clean up Hawthorne Park on Monday morning." ER-146. The district court found that Defendant Clauson "knew about and approved" the operation plan to implement City Manager Sjothun's closure order. ER-7.

No facts in the summary judgment record suggest that Defendant Clauson was in Hawthorne Park on September 22, 2020, or that he had any interaction with Plaintiff.

### 3. Randal Jewell

Defendant Medford Police Corporal Randal Jewell is alleged to have been the Event Supervisor for the Hawthorne Park operation and was present in the park on September 22, 2020. The district court found that he prepared the operation plan to implement the City Manager's closure order, and he also stood in Hawthorne Park when Plaintiff was arrested. ER-7, 8. No facts in the summary judgment record suggest that Defendant Jewell had any interaction with Plaintiff or any involvement in her arrest.

### 4. Trevor Arnold

Defendant Medford Police Lt. Trevor Arnold was found by the district court to have been the Incident Commander for the Hawthorne Park operation, the contact person for the media, and the person who approved the operation plan created by Defendant Jewell. The district court found that Lt. Arnold was the person who identified the area where he would meet with any members of the media who had questions for the Medford Police Department about the police operation. ER-6. No facts in the summary judgment record suggest that Defendant Arnold had any interaction with Plaintiff or any involvement in her arrest.

### 5. Steven Furst

Defendant Medford Police Officer Steven Furst was found by the district court to have entered Hawthorne Park and "focused his attention on confronting

and evicting reporters and observers." ER-8.[2]  He informed Ms. Fonseca that the park was closed and that she needed to leave. Defendant Furst arrested Ms. Fonseca for trespass when she refused to leave the park. *Id.*

### 6.    James Barringer and Michael Todd

Defendant Medford police officers James Barringer and Michael Todd were found by the district court to have "joined [Defendant Furst] in subduing and handcuffing plaintiff." ER-8. The district court made no additional factual findings of conduct by these two Defendants related to Ms. Fonseca.

### 7.    Geoffrey Kirkpatrick

Defendant Medford police officer Geoffrey Kirkpatrick was found by the district court to have stood next to Defendant Jewell in Hawthorne Park during the time Ms. Fonseca was arrested to "help form a perimeter around the arresting officers." ER-8. The district court found no additional facts related to Defendant Kirkpatrick. The summary judgment record showed that he had no interaction with Plaintiff and, beyond standing in the park, no involvement in her arrest.

### C.    PLAINTIFF'S CLAIMS

Ms. Fonseca brought the same two federal claims against each of the Individual Defendants. Pursuing both claims under 42 U.S.C. § 1983, she alleged that each of them violated her First Amendment right to engage in her occupation

---

[2]As noted in footnote one, Defendants do not agree with this characterization, but this appeal is not the vehicle to challenge that finding.

as a reporter by excluding her from Hawthorne Park, and her Fourth Amendment rights when she was arrested for trespass (and searched incident to arrest) without probable cause. ER-144-153.

### D.  PROCEDURAL HISTORY

Each of the Individual Defendants moved for summary judgment on Plaintiff's two claims against them, invoking their rights to qualified immunity. The Individual Defendants argued that under the "right of access" analysis, Ms. Fonseca's right to be in a closed location to observe a police operation did not outweigh the City's legitimate interest in temporarily closing the park to all but those actively assisting in the operation and, as such, her First Amendment right of access was not violated. The Individual Defendants further argued that Ms. Fonseca's right to be in the presumptively legitimately closed park was not clearly established on September 22, 2020. ER-27-41, 84-109.

The district court denied summary judgment on qualified immunity to all of the Individual Defendants, asserting the same general reasoning for all denials. In sum, the district court found Ms. Fonseca had a First Amendment right to be in the closed park on September 22, 2020, to observe and record police activity. As such, the district court concluded the decision to exclude Ms. Fonseca, a reporter, from Hawthorne Park on September 22, 2020, was a content-neutral prior restraint on speech subject to scrutiny under the reasonable time, place, manner test. Applying

that test, the district court found that an issue of fact existed as to whether the prior restraint was narrowly tailored to achieve a significant government interest and at the same time left open ample alternative channels for communication, *i.e.,* whether the prior restraint violated Ms. Fonseca's First Amendment rights. ER-11.

The district court further found that Ms. Fonseca's First Amendment right to report on police activity from a public forum was clearly established. *Id.*

The district court did not make separate findings for each Individual Defendant regarding their respective role in causing the alleged First Amendment violation.

With respect to Ms. Fonseca's Fourth Amendment claim, the district court found that if the decision to exclude Ms. Fonseca from Hawthorne Park violated her First Amendment right, then the arrest of Ms. Fonseca could not have been supported by probable cause. And, the district court concluded Ms. Fonseca's Fourth Amendment right to only be arrested on probable cause was clearly established. ER-19. The district court therefore held that the issue of fact on the First Amendment claim precluded qualified immunity on the Fourth Amendment claim. *Id.*

Again, the district court made no separate findings for each Individual Defendant regarding their respective role in causing the alleged Fourth Amendment violation.

15

## V.   SUMMARY OF THE ARGUMENT

The district court analyzed this case as a prior-restraint restriction on speech in a public forum, applying a time, place, manner analysis. It denied qualified immunity to the Individual Defendants because it found that an issue of fact existed as to whether the City Manager's closure order was narrowly tailored to serve a significant government interest, and whether it left open ample alternative channels for communication. ER-11. Yet, the facts as found by the district court established that Hawthorne Park was a closed location, not a public forum, at all times material here. A time, place, manner analysis was not appropriate under the facts of this case.

The district court found that City Manager Sjothun issued a closure order pursuant to his authority under the City Charter. Ms. Fonseca did not challenge the constitutionality of the City Charter provision allowing such a closure or the authority of Defendant Sjothun to close Hawthorne Park. To the contrary, the district court accepted as undisputed the factual allegation in Ms. Fonseca's complaint that the closure order was in place on September 22, 2020, and that she was informed that the park was closed prior to being asked to leave. ER-6, (*see* Complaint 10, 146-148.

As such, the district court's inquiry on the first prong of its qualified immunity analysis should have been to determine whether Ms. Fonseca had a First

Amendment right to access a location closed to the general public for the purpose of observing and recording the police operation occurring therein. The district court's decision to instead analyze the closure order itself to determine whether it was a legitimate prior restraint on speech was legal error.

Because the undisputed facts established that Ms. Fonseca was attempting to observe and record police activity from a location that was not open to the general public, the district court should have applied the "right of access" analysis to determine if Ms. Fonseca's First Amendment right had been infringed upon. Application of the "right of access" analysis to the facts as they were found by the district court could have resulted only in the conclusion that Ms. Fonseca's First Amendment right of access was not violated as a matter of law.

The district court's application of the wrong analysis (*i.e.,* whether the closure order was a permissible time, place, manner restriction on speech) also led to its error in evaluating the second prong of qualified immunity. The district court incorrectly identified the right at issue as "a reporter's [right of] access to a public forum to observe and report police activity," finding such right to be "clearly established under First Amendment precedent." ER-23. Thus, the district court held, "whether Defendants violated these rights is a question for the jury to decide." *Id*.

Qualified immunity on the "clearly established" prong was warranted for each Individual Defendant even if it was assumed that the closure order was an unconstitutional prior restraint on speech in violation of Ms. Fonseca's First Amendment rights. To deny qualified immunity to each of the Individual Defendants, the district court had to find that it was clearly established in September 2020 that each of their individual actions in issuing, approving, implementing, or enforcing the closure order would violate Ms. Fonseca's First and/or Fourth Amendment rights. Such a conclusion could not be made based on the facts as found by the district court. Each Individual Defendant was acting in accordance with the reasonable belief that Hawthorne Park was legitimately closed pursuant to the City Manager's authority under the (unchallenged) City Charter provision.

For these reasons, each of the Individual Defendants was entitled to qualified immunity on both of Ms. Fonseca's claims.

## VI.   STANDARD OF REVIEW

The Ninth Circuit Court of Appeals reviews de novo all constitutional rulings and all grants or denials of qualified immunity. *See Fournier v. Sebelius*, 718 F.3d 1110, 1117 (9th Cir. 2013) (constitutional rulings); *Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005) (qualified immunity).

## VII. LEGAL ARGUMENT

### A. LAW ON QUALIFIED IMMUNITY

The doctrine of qualified immunity shields public officials performing discretionary functions from personal liability under certain circumstances. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As the Supreme Court explained in *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 639 (citations omitted). "An official's claim of qualified immunity will be defeated if, in the light of pre-existing law, the unlawfulness of his conduct was apparent." *Id*. at 640.

"Qualified immunity is necessary to protect the public from unwarranted timidity on the part of public officials and to avoid dampening the ardor of all but the most resolute, or the most irresponsible. *Richardson v. McKnight*, 521 U.S. 399, 408 (1997) (citation and internal quotation marks omitted). "True to these purposes, the qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

Here, Ms. Fonseca has asserted direct actions against each of the Individual Defendants. As such, she was required to identify the specific conduct of each Defendant that, in and of itself, caused a constitutional violation. *See Jones v. Williams,* 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under § 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under § 1983.").

When an officer claims qualified immunity, the court asks "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019) (*quoting Lal v. California,* 746 F.3d 1112, 1116 (9th Cir. 2014)). Courts have discretion to decide which of the two prongs "should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## B.    PLAINTIFF'S FIRST AMENDMENT CLAIM

The district court found a question of fact existed on the first inquiry for qualified immunity – whether a constitutional violation occurred. The district court applied a content-neutral prior restraint analysis to the City Manager's closure order, concluding a question of fact existed on the issue of whether the closure order was a reasonable time, place and manner restriction on Ms. Fonseca's

speech. ER-10-15. The district court's choice of analysis, under the facts of this

case, was error.

### 1. Established Facts in the Summary Judgment Record Material to Ms. Fonseca's First Amendment Right

Ms. Fonseca alleged, and thus judicially admitted, in her Complaint that:

- City Manager Sjothun temporarily closed Hawthorne Park pursuant to his authority to under Medford City Charter § 18(3)(e).

- The purpose for temporarily closing Hawthorne Park was to clean it up.

- The closure of Hawthorne Park was in effect at 8:00 a.m. on September 22, 2020.

- Pursuant to the City of Medford operation plan for the Hawthorne Park cleanup, only people actively packing up to leave the park and those people assisting the clean up or the provision of resources to the campers were allowed in the park during the temporary closure.

- Plaintiff entered Hawthorne Park while it was closed.

- Plaintiff was at Hawthorne Park to observe and document law enforcement activity and interactions with campers, not to assist in their leaving or to provide the campers with resources.

- Plaintiff was informed by law enforcement that Hawthorne Park was closed, and she was trespassing. She was told to leave the park.

- When Plaintiff refused to leave Hawthorne Park, she was arrested for trespassing.

ER-146-148.

Similarly, the district court found as established fact that:

- On September 18, 2020, City Manager Sjothun issued an order pursuant to City of Medford City Charter § 18(3)(e) for the closure of

Hawthorne Park in Medford, Oregon for 48 hours, commencing on
September 21, 2020 at 8:00 a.m.

- The City Manager's stated purpose for the closure order was to "allow
  for sanitation, cleaning and inspection of City property."

- Although not stated in the implementation plan, the closure order
  excluded "reporters and observers from the park during the clearance."[3]

- Medford police officers were told that anyone who was helping the
  campers pack and move, not just City employees and resource agency
  representatives, could remain in the park.

- Plaintiff entered Hawthorne Park on September 22, 2020, and was
  "observing and recording police clearing a homeless encampment."

ER-6-8.

## 2. District Court's Application of the First Amendment's Prior Restraint on Speech Analysis

Based on the above allegations and admissions set forth in her Complaint,

Ms. Fonseca asserted claims under 42 U.S.C. § 1983 against the Individual

Defendants in their personal capacities for violations of her First and Fourth

Amendment rights. ER-148-149, 150. Ms. Fonseca did not assert a claim for

injunctive or declaratory relief related to City Charter provision 18(3)(e) or

otherwise ask the district court to evaluate the validity of the Hawthorne Park

closure order. To the contrary, she premised all of her claims against the Individual

---

[3]The implementation plan did not specifically call out or target journalists. It
excluded all of the public except for specific limited categories, and journalists
were not one of those specifically named categories. ER-122-123.

Defendants[4] on the undisputed fact that she entered a park that had been closed to the general public. ER-146-147.

Despite its acceptance as established, unchallenged fact that Hawthorne Park had been closed to the public, the district court erroneously concluded that Ms. Fonseca was engaged in the expression of speech, *i.e.,* reporting ideas to the public, in "a traditional public forum where First Amendment protections against restraint on speech are at their strongest." ER-10. As such, the district court found that the act of not allowing Ms. Fonseca to remain in Hawthorne Park to observe and record police interactions with the illegal campers was a "content-neutral restriction of First Amendment protected activity in a public forum." ER-11. The district court, therefore, required that the "prior restriction" of Ms. Fonseca's speech had to be (1) narrowly tailored to serve a significant government interest and (2) leave open ample alternative channels for communication, sometimes known as the reasonable time, place, manner test. ER-11.

The district court's chosen analysis was legal error. A governmental restriction on observing and gathering information in a location closed to the

---

[4] In her municipal liability claim against the City of Medford, Ms. Fonseca references an alleged City policy to issue a closure order that was not narrowly tailored. ER-23. That allegation is not made in any of the claims against the Individual Defendants.

general public is not a prior restraint on speech subject to the stringent review of a time, place, manner test.

### 3. Distinction Between the Right to Freedom of Speech and the Right to Access Information

The Supreme Court has recognized that the concept of a free and unfettered media necessarily implies the existence of safeguards to insure access, for "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Such protection, however, is neither absolute nor as far reaching as freedom of speech itself. As the Second Circuit has noted, "[t]o claim a value in access to information comparable to the value of freedom of expression is to ignore 200 years of First Amendment jurisprudence." *In re Application of The Herald Co.*, 734 F.2d 93, 100 (2d Cir. 1984).

The Supreme Court has held that, "the right to speak and publish does not necessarily provide for the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17, (1965). As *Branzburg* noted:

> [I]t has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.

408 U.S. at 684. Rather, the First Amendment requires that "the media's right of access be at least equal to that of the general public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 586 n.2 (1980) (Brennan, J., concurring in

24

judgment); *see also California First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) ("The First Amendment to the United States Constitution affords no greater right to reporters to access locations or information that are not available to the public at large.").

In *Pell v. Procunier*, 417 U.S. 817, 834 (1974), the Supreme Court held that "[t]he First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally." *Pell* explained that:

> [t]he proposition that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally . . . finds no support in the words of the Constitution or in any decision of this Court.

417 U.S. at 834-835.

In *Houchins v. KQED, Inc*., 438 U.S. 1 (1978), the Supreme Court distinguished the recognized First Amendment right to speak on information already obtained, from an alleged right to obtain information in the first instance. The Court explained with regard to the latter that while "there is an undoubted right to gather news, the right only extends to the gathering of news from 'any source by means within the law.'" *Id.* at 11, *quoting Branzburg v. Hayes*, 408 U.S. 665682 (1972). *Houchins* explained that: "[a]ny reference in Supreme Court

precedent to constitutional entitlement of the public to information held by the government means no more than that the government cannot restrain communication of whatever information is in fact acquired.'" *Id.* at 10.

The district court found that Hawthorne Park was closed to the general public at the time material here. ER-6. Plaintiff alleged and admitted this same fact in her Complaint. ER-146-147. It was, therefore, legally incorrect for the district court to presume as the basis of its analysis that Ms. Fonseca had an unfettered right to remain in Hawthorne Park to observe and record police activity, subject only to the most narrowly tailored of time, place, manner restrictions. Rather, the district court should have analyzed whether, under the facts as established or interpreted in her favor, Ms. Fonseca had the right to access Hawthorne Park on September 22, 2020.

### 4. Denial of Right of Access Allowed When Reasonably Related to a Legitimate Government Interest

In *S.H.A.R.K.,* the court determined that "the case before us is about access to information as opposed to the right to expression. Although access cases are rooted in First Amendment principles, they have developed along distinctly different lines than have freedom of expression cases." The court then explained the proper analysis in a right of access case:

> The rule which emerges from this caselaw is reasonably
> clear. Although the press cannot command access
> wherever, whenever, and however it pleases, neither can

> government arbitrarily shroud genuinely newsworthy events in secrecy. Members of the press, to their own behoof and as representatives of the public, have some (limited) claim to access when government attempts selectively to delimit the audience (or when government cooperates in enforcing such restrictions). In such circumstances, the state's rulemaking power is not absolute: if the First Amendment is to retain a reasonable degree of vitality, the limitations upon access must serve a legitimate governmental purpose, must be rationally related to the accomplishment of that purpose, and must outweigh the systemic benefits inherent in unrestricted (or lesser-restricted) access.

*Id.* 499 at 559, *citing D'Amario v. Providence Civic Ctr. Auth*., 639 F. Supp. 1538, 1543 n. 4 (D.R.I. 1986), *aff'd without opinion*, 815 F.2d 692 (1st Cir. 1987).

Further, where some members of the public are permitted access to an otherwise closed event or location, there must be some reasonable justification, some legitimate basis, for any governmental obstruction of media access. *American Broadcasting Companies v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977).

Applied here, the denial of Ms. Fonseca's access to Hawthorne Park while it was closed was constitutionally permissible if the exclusion was rationally related to the accomplishment of a legitimate governmental purpose. *American Broadcasting Companies,* 570 F.2d at 1083.

The district court found as fact that the City wanted to clear the illegal campground from Hawthorne Park "to allow for sanitation, cleaning, and inspection of City property" and due to an "increase in littering, drug use and other

illegal behavior." ER-12. It found that the City also presented evidence in support of its position that the general public was excluded during the closure for safety reasons, "fearing that the clearance could be volatile and that the damage to the park posed a general threat to health and safety." ER-12. See also ER-111, 112, 118, 119, 121, 137-139.

With this factual record, instead of finding reasons why the City's interests were not "significant enough", the district court should have asked (1) whether the City's stated objective of protecting public health and safety during the relocation efforts was a legitimate governmental purpose and, if so, (2) whether temporarily closing the park to all but those assisting in the relocation efforts was a rational means of accomplishing purpose. Because it applied the wrong test in its analysis, the district court found a question of fact existed as to whether such governmental objectives were significant enough to meet the substantial showing necessary to justify a prior restraint on speech under a time, place, manner test. ER-12.

Had the district court applied the correct analysis, it would not have questioned the significance of the City's interest in the safety of the operation. Rather, it would have noted the evidence as existing in the record and being, at a minimum, some evidence of a legitimate interest. It then should have reviewed and then concluded that the City's closure of Hawthorne Park to all members of

the general public other than those actively assisting in the operation was rationally related to the City's legitimate interest.

A similar situation to that presented here was considered by the Second Circuit in *Meyers v. City of New* York, 812 F. App'x 11 (2d Cir. 2020). In *Meyers*, a group of protestors known as "Occupy Wall Street" started a demonstration to protest what they saw as rising economic inequality and the improper influence of corporations on government. To amplify that message, hundreds of protestors, the plaintiffs among them, took up residence in Zuccotti Park in Manhattan's Financial District.

Over the course of many weeks, the protestors erected tents and other structures that the city claimed violated the city's sanitation laws and limited the public's access to the park. The city also claimed that crime and hazardous conditions began to proliferate in the park. In response to those concerns, NYPD officers ordered all persons present in the park to leave with their personal belongings or face arrest. While many protestors complied with the dispersal order, approximately 150, including the plaintiffs, refused to leave and were subsequently arrested for trespass. Plaintiffs thereafter sued, alleging the city's dispersal order violated their First Amendment rights, and that their arrests subsequent to that allegedly unconstitutional order, violated their Fourth and Fourteenth Amendment

rights. The district court entered judgment on the pleadings in favor of Defendants, finding that Plaintiffs had failed to allege a constitutional violation. *Id.* at 13.

On appeal, the Second Circuit applied the right of access analysis and determined that the public interest in allowing the protestors' access to the park to express their opinions was outweighed by the city's need to disperse the protestors for safety reasons. The court stated:

> As an initial matter, we conclude that the dispersal order was lawful because it was intended to promote several legitimate governmental goals and was therefore not arbitrary. The City had a legitimate interest in ensuring that the park remained accessible to all members of the public – not just the protestors – and free of congestion. In addition, the City had a significant interest in clearing the Park of unlawful structures and mounting fire hazards.

*Id.* at 14.

After determining that the dispersal order was lawful, the court found that the plaintiffs' refusal to comply with that lawful dispersal order supplied probable cause to arrest them for disorderly conduct. *Id.* at 14-15 ("In any event, the NYPD also had probable cause to arrest Plaintiffs for trespassing once they refused to leave the Park after being ordered to do so.").

Here, under the City Manager's closure order and the implementing operation plan, Hawthorne Park was closed to the general public on September 22, 2020, with exceptions made only for those persons actively assisting in the City's

objective to relocate the illegal campers and their belongings and connect them with community resources. Ms. Fonseca was doing neither. As found by the district court, Ms. Fonseca was in Hawthorne Park to "observe and record" information with an "intent to report on the clearance." Opinion 7. Because the general public could not access the closed park for those purposes, Ms. Fonseca could not either.

When applying the proper analysis to the facts as found by the district court, Ms. Fonseca's claim for violation of her First Amendment rights fails as a matter of law.

### 5. District Court Erred in Finding the Individual Defendants' Conduct Violated a Clearly Established Right

Even if it were assumed that excluding Ms. Fonseca from Hawthorne Park violated her First Amendment rights, such a right, under the facts presented here, was not clearly established in September 2020.

In *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), the Supreme Court explained that "qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." As such, the protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting) (*quoting Butz v. Economou*, 438 U.S. 478, 507 (1978), for the proposition that

qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law.").

In this case, each of the Individual Defendants was acting pursuant to closure order and operation plan. As stated, there was no claim presented to the district court challenging the City Manager's authority to close a public park for the purposes at issue here. Nor was evidence presented that the City Manager's closure order had been or is being challenged as unconstitutional. Each of the Individual Defendants, therefore, was entitled to presume that the authority they were acting under or pursuant to was valid at the time of their conduct.

In *Saved Magazine v. Spokane Police Dept.*, 19 F.4th 1193 (9th Cir. 2021), the Ninth Circuit reviewed a relatively similar factual presentation of a claim for qualified immunity. In *Saved Magazine*, the plaintiff, a reporter, brought direct 42 U.S.C. § 1983 actions against an individual officer for enforcing law enforcement-created "protest zones" that the plaintiff claimed violated his First Amendment rights. In its review of the lower court's granting of qualified immunity to the officer, the court explained:

> [a]pplying a typical First Amendment framework to Plaintiffs' claim leaves us with the proverbial task of trying to fit a square peg in a round hole. In most cases where restrictions on speech are challenged pursuant to the First Amendment, we ask whether a legislative act, such as a city ordinance or permit scheme, unconstitutionally infringes on speech. But Plaintiffs do not challenge a city ordinance or permit scheme, and they

> expressly do not challenge the Spokane Police
> Department's use of separate protest zones. Instead,
> Plaintiffs' challenge is directed at Officer Doe's
> enforcement of these zones. We are not aware of any
> precedent that would alert Officer Doe that his
> enforcement would violate clearly established First
> Amendment law.

*Id.* at 1199-1200.

The *Saved Magazine* court relied on its decision in *Grossman v. City of Portland,* 33 F.3d 1200 (9th Cir. 1994) to affirm the award of qualified immunity to the officer. In *Grossman*, the Ninth Circuit granted qualified immunity to an officer because "his allegedly unconstitutional action" was "simply to enforce an ordinance which was duly enacted by the city council." *Grossman* at 1209. Although the court concluded that the ordinance violated the First Amendment, the officer's enforcement of that ordinance was held not to be clearly unconstitutional because "law enforcement officers may generally reasonably assume that policies or orders promulgated by those with superior authority are constitutional unless those policies or orders are patently violative of fundamental constitutional principles." *Id.*

Similarly, in *Pierson v. Ray*, 386 U.S. 547, 555 (1967), the Supreme Court observed that "a policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause and being mulcted in damages if he does." For this reason, the Supreme Court held that "although the matter is not entirely free from doubt, the same

consideration would seem to require excusing him [the police officer] from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied." *Id.; see also Malachowski v. City of Keene,* 787 F.2d 704, 713-14 (1st Cir.), *cert. denied*, 479 U.S. 828, 93 L. Ed. 2d 56, 107 S. Ct. 107 (1986)("[A]n officer who acts in reliance on a duly enacted statute or ordinance is ordinarily entitled to qualified immunity.")

In *Thomas v. City of Talent*, 271 Fed. Appx. 677, 678 (9th Cir. 2008), the plaintiff brought claims against City of Talent police officers under 42 U.S.C. § 1983, alleging violations of his Fourth and Fourteenth Amendment rights after being cited by those officers for violating a city ordinance prohibiting camping in a city park. Affirming the district court's award of qualified immunity to the officers, the Ninth Circuit held that: "Talent police officials were entitled to qualified immunity regarding Thomas's claim that he was unreasonably stopped and issued a citation because, even though an Oregon state court later ruled that the city ordinance was invalid, a reasonable officer could have believed that the ordinance was constitutional." *Id.* at 687.

In *Evers v. County of Custer*, 745 F.2d 1196, 1203 (9th Cir. 1984), the Ninth Circuit stated that "[c]ourts have accordingly held that the existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional. The

exception to allowing immunity in such a case requires extreme circumstances." *Grossman* cited the Holocaust and the My Lai massacre as examples of an official directive that is so patently violative of fundamental constitutional principles that an officer who enforces it would lose their entitlement to qualified immunity. But, short of such obvious constitutional deficiencies, "an officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability." 33 F.3d 1200, 1208-1210; *see also Dittman v. California,* 191 F.3d 1020, 1027 (9th Cir. 1999) ("[W]hen a public official acts in reliance on a duly enacted statute or ordinance, that official is entitled to qualified immunity.").

Here, as set forth above, each of the Individual Defendants was acting pursuant to a City Charter, a directive of the City Manager, and/or a directive of a superior officer when their conduct was undertaken. Each of the Individual Defendants was entitled to believe that the authority they acted pursuant to was constitutional.

Yet, the district court denied qualified immunity. To do so, it made a general finding that Ms. Fonseca's right to freedom of speech was clearly established, and thus every reasonable person in the same position as each of the Individual Defendants would have known that their specific actions violated Ms. Fonseca's constitutional rights. ER-23.

The district court defined the right at issue too broadly for a qualified immunity analysis. In *Saved Magazine,* the Ninth Circuit observed that: "Plaintiffs

argue that their clearly established rights were violated because any officer would know that censoring what someone can say in a public space raises serious First Amendment issues that we must review applying strict scrutiny." 19 F.4th 1198-1199. The court disagreed with the plaintiffs' portrayal of their constitutional right for purposes of qualified immunity. The court explained that:

> Plaintiffs' arguments rely on abstract formulations of First Amendment law that define their rights at a high level of generality. As the Supreme Court explained, however, clearly established law must be particularized to the facts of the case. If this is not done, plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*Id.* at 1199 (internal quotations and citations omitted).

In the present case, the City Manager Sjothun issued a closure order that was within the scope of his authority under the City Charter. The proper question for qualified immunity for Defendant Sjothun is whether it was clearly established in September 2020 that the City Manager's decision to issue this specific closure order pursuant to his authority under the City Charter to issue such orders would violate Ms. Fonseca's First Amendment right.

For Defendants Kirkpatrick and Jewell, the district court should have asked whether it was clearly established that the implementation of the City Manager's order to close the park to the general public through the issuance of an operation

plan that excepted from the closure community resource representatives and volunteers who were assisting in accomplishing the City Manager's objectives would violate Ms. Fonseca's First Amendment rights.

For Defendant Clauson, the district court should have asked whether it was clearly established that his knowledge and approval of the implementation of the City Manager's closure order through the issuance of an operation plan that excepted from the closure the community resource representatives and volunteers who were assisting in accomplishing the City Manager's objectives would violate Ms. Fonseca's First Amendment rights.

For Defendants Furst, Todd and Barringer, the district court should have asked whether it was clearly established that their reliance on their commanding officers' direction that the park was closed and anyone not actively assisting in the clearance or relocation was excluded and should be removed from the park would violate Ms. Fonseca's First Amendment rights.

For Defendant Kirkpatrick, the district court should have asked whether it was clearly established that his presence in Hawthorne Park near Ms. Fonseca when she was arrested would violate her First Amendment rights.

## C.    PLAINTIFF'S FOURTH AMENDMENT CLAIM

Ms. Fonseca also asserted a claim against the Individual Defendants under 42 U.S.C. § 1983 for violation of her Fourth Amendment rights, claiming her arrest

and the search of her person and belongings incident to arrest were not supported by probable cause.

The district court analyzed the Fourth Amendment claim as being wholly dependent on the outcome of the First Amendment claim. It reasoned that if the alleged time, place, manner restriction was unconstitutional, then Ms. Fonseca was allowed to remain in the park and, as such, there was no probable cause to arrest her for trespass. Again, the district court made no distinction between the acts of any of the Individual Defendants on this claim. ER-19.

### 1. Direct Action Against Defendants Sjothun, Claussen, Arnold, Jewell and Kirkpatrick

No facts in the summary judgment record, and none found by the district court, indicate that Defendants Sjothun, Claussen, Arnold, Jewell[5] or Kirkpatrick played a role in the arrest, search or seizure of Ms. Fonseca. None of those Individual Defendants arrested Ms. Fonseca, either with or without probable cause. They were all entitled to qualified immunity on the Fourth Amendment claim as not having directly caused a constitutional violation.

In addition, for the reasons explained above related to the First Amendment claim, all of the Individual Defendants were entitled to rely on the validity of the

---

[5]In its opinion, the district court correctly found that Defendant Furst arrested Ms. Fonseca. It then erroneously identified Defendant Jewell as the person who "arrested Ms. Fonseca and took her to jail." ER-8. That factual error should be considered a clerical error. Defendant Furst, not Jewell, arrested Ms. Fonseca. ER-132-134.

closure order issued under the authority of the City Charter. It was not clearly established that reliance on the constitutionality of that order would violate Ms. Fonseca's Fourth Amendment rights.

### 2. Direct Action Against Defendants Furst, Todd and Barringer

"The Fourth Amendment protects the right to be free from unreasonable searches and seizures." *Davis v. United States*, 564 U.S. 229, 236 (2011). An arrest supported by probable cause is reasonable under the Fourth Amendment as a matter of law. *See Beck v. Ohio,* 379 U.S. 89, 91 (1964) (Holding that probable cause to arrest exists when the facts and circumstances within an officer's knowledge and of which he or she had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense.).

The district court found that on September 22, 2020, Ms. Fonseca refused to obey an order from Defendant Furst to leave the park. ER-8. As explained above, it was reasonable for Defendants Furst, Todd and Barringer to believe that the City Manager's order closing the park to the general public was valid. It was also reasonable for those officers to believe that their commanding officers' direction to except from the closure order those members of the general public who were actively assisting in the police operation was valid. The facts established that

Officers Furst, Todd and Barringer observed Ms. Fonseca in the park but not actively assisting in the police operation.

The Medford Municipal Code (MMC) § 5.250 prohibits Trespass-Premises and states, "no person shall enter or remain unlawfully in or on the premises." Under MMC § 5.240, a "premises" includes any building or property, whether publicly or privately owned, and the term "enter or remain unlawfully" includes failing to leave premises after being lawfully directed to do so by a person in charge or a person who has lawful control of premises through ownership, official position or other legal relationship. ER-143.

Whether ultimately deemed unconstitutional, the closure order and operation plan in effect at the time of Mr. Fonseca's arrest excluded Ms. Fonseca from the closed park. There was no dispute in the summary judgment record that Ms. Fonseca was informed by Defendant Furst that she had to leave the park or she would be arrested for trespassing. There was no dispute that Plaintiff refused Defendant Furst's command to leave the park. For those reasons, there was no dispute in the summary judgment record that, at the time Defendants Furst, Todd and Barringer arrested Ms. Fonseca, probable cause existed for that arrest. As such, the undisputed facts showed that there was no Fourth Amendment violation by Defendants Furst, Todd or Barringer as a matter of law. At the time of Ms. Fonseca's arrest, probable cause existed to arrest her.

In addition, for the reasons stated above, it was not clearly established that reliance on the constitutionality of the City Manager's closure order would violate Ms. Fonseca's Fourth Amendment rights at the time of her arrest.

The district court erred in denying qualified immunity to the Individual Defendants on Ms. Fonseca's Fourth Amendment claim.

## VIII. CONCLUSION

For the foregoing reasons, the Individual Defendants respectfully ask that the district court's denial of qualified immunity on Plaintiff's 42 U.S.C. § 1983 claims against them be reversed and qualified immunity be awarded as a matter of law. Alternatively, the Individual Defendants respectfully request that the district court's denial of qualified immunity be reversed, and the case be remanded to the district court to evaluate their claims for qualified immunity under the right of access/rational relation analysis.

Respectfully submitted this 31st day of July 2025.

HUTCHINSON COX

By:   s/Andrea D. Coit
       Andrea D. Coit, OSB No. 002640
       acoit@eugenelaw.com
       Emily M. Perkins, OSB No. 222553
       eperkins@eugenelaw.com
       Of Attorneys for Defendants-Appellants

# STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, I certify that I am unaware of any related cases currently pending in this court.


July 31, 2025 _____      _s/Andrea D. Coit_____
Date                                        Andrea D. Coit, OSB No. 002640
                                            acoit@eugenelaw.com
                                            Emily M. Perkins, OSB No. 222553
                                            eperkins@eugenelaw.com
                                            Of Attorneys for Defendants-Appellants

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a), I certify that the attached

**DEFENDANTS-APPELLANTS' OPENING BRIEF** has been prepared in a

proportionately spaced typeface in Times New Roman, 14-point font, and contains

9,243 words.

July 31, 2025                              s/Andrea D. Coit             
Date                                        Andrea D. Coit, OSB No. 002640
acoit@eugenelaw.com
Emily M. Perkins, OSB No. 222553
eperkins@eugenelaw.com
Of Attorneys for Defendants-Appellants

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on July 31, 2025, I electronically filed the foregoing

**DEFENDANTS-APPELLANTS' OPENING BRIEF** with the Clerk of the Court

for the United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and

that service will be accomplished by the appellate CM/ECF system.

HUTCHINSON COX

By: s/Andrea D. Coit
    Andrea D. Coit, OSB No. 002640
    acoit@eugenelaw.com
    Emily M. Perkins, OSB No. 222553
    eperkins@eugenelaw.com
    Of Attorneys for Defendants-Appellants