No. 25-2618

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

JAMES BARRINGER; SCOTT CLAUSON; BRIAN SJOTHUN; STEVEN
FURST; TREVOR ARNOLD; CITY OF MEDFORD; GEOFFREY
KIRKPATRICK; RANDAL JEWELL; MICHAEL TODD,
Defendants-Appellants,

v.

APRIL FONSECA, aka APRIL EHRLICH,
Plaintiff-Appellee.

_____

On Appeal from the United States District Court for the District of Oregon
No. 1:22-cv-01416-CL (Magistrate Judge Mark D. Clarke)

_____

## CONSENT BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE
## FOR FREEDOM OF THE PRESS AND 30 NEWS AND MEDIA
## ORGANIZATIONS IN SUPPORT OF APPELLEE APRIL FONSECA

_____

Gabriel Rottman
    *Counsel of Record for Amici Curiae*
Mara Gassmann*
Grayson Clary
Renee M. Griffin*
THE REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
grottman@rcfp.org
    *Of Counsel*

## CORPORATE DISCLOSURE STATEMENTS

Amici curiae, by and through undersigned counsel and pursuant to the Federal Rules of Appellate Procedure, certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

Advance Publications, Inc. ("Advance") certifies that it has no parent corporation and no publicly held corporation owns any of its stock.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc.  No publicly held corporation owns 10% or more of its stock.

Axios Media Inc. is a privately owned company, and no publicly held company owns 10% or more of its stock.

BuzzFeed Inc. is a privately owned company, and National Broadcasting Company (NBC) owns 10% or more of its stock.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Cityside is a 501(c)(3) nonprofit organization.

Dow Jones & Company, Inc. ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company.  Ruby Newco, LLC, an indirect

i

subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC. No publicly traded corporation currently owns ten percent or more of the stock of Dow Jones.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

What's Happening Inc (d/b/a Eugene Weekly) is a privately owned news organization that has no parent company and issues no stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Gales Creek Journal LLC is a wholly-owned subsidiary of Firestarter Media LLC, a holding company owned by Jacob Hundley. Gales Creek Journal LLC and Firestarter Media LLC are both privately held companies with no securities in the hands of the public.

KQED Inc. is a nonprofit public benefit corporation. No entity or person has an ownership interest of 10 percent or more of KQED Inc.

The Los Angeles Press Club is a 1,000 member strong 501c3 nonprofit organization with no parent corporation and no stock.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

MediaNews Group Inc. is a privately held company.  No publicly-held company owns ten percent or more of its equity interests.

The National Freedom of Information Coalition is a nonprofit organization that has not issued any shares or debt securities to the public, and has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

National Public Radio, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

News in the Grove LLC is a wholly-owned subsidiary of Firestarter Media LLC, a holding company owned by Jacob Hundley. News in the Grove, LLC and Firestarter Media LLC are both privately held companies with no securities in the hands of the public.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the

United States and internationally. It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

The News Guild – CWA is an unincorporated association. It has no parent and issues no stock.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Oregon Public Broadcasting (OPB) is a nonprofit public benefit corporation with no parent corporation and issues no stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

The Seattle Times Company: The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENTS ....................................................... i

TABLE OF AUTHORITIES ................................................................ viii

SOURCE OF AUTHORITY TO FILE ................................................... xii

FED. R. APP. P. 29(a)(4)(E) STATEMENT ......................................... xii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................. 1

SUMMARY OF THE ARGUMENT ....................................................... 3

ARGUMENT ............................................................................. 6

  I.  The First Amendment protects the right of the press and public to document government operations, including encampment sweeps in parks. ................. 6

  II.  Constitutional scrutiny is essential to protect the rights of the press, and the District Court's analysis was the correct one. ............................................... 12

      A.  The First Amendment demands that Appellants narrowly tailor restrictions on newsgathering and leave open ample alternative channels for reporting. .......................................................... 12

      B.  Appellants' proposed rational-basis test would eviscerate the press's ability to cover newsworthy events in public places. ........................... 13

      C.  Appellants' actions were not tailored to a significant government interest and failed to leave open alternative channels for reporting on the sweep. ...................................................................... 18

CONCLUSION ......................................................................... 21

CERTIFICATE OF SERVICE ........................................................ 22

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS .......................... 23

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s):**

*Anderson v. City of Hermosa Beach,*
   621 F.3d 1051 (9th Cir. 2010) ...............................................................10

*Ariz. Broads. Ass'n v. Brnovich,*
   626 F. Supp. 3d 1102 (D. Ariz. 2022) ..................................................20

*Askins v. U.S. Dep't of Homeland Sec.,*
   899 F.3d 1035 (9th Cir. 2018) ....................................................... 7, 19

*Berger v. City of Seattle,*
   569 F.3d 1029 (9th Cir. 2009) ...............................................................20

*Brown v. Kemp,*
   86 F.4th 745 (7th Cir. 2023) ..................................................................19

*Chestnut v. Wallace,*
   947 F.3d 1085 (8th Cir. 2020) ...................................................... 18, 19

*Cox Broad. Corp. v. Cohn,*
   420 U.S. 469 (1975) ...............................................................................14

*First Amend. Coal. v. Ryan,*
   938 F.3d 1069 (9th Cir. 2019) ...............................................................19

*Fordyce v. City of Seattle,*
   55 F.3d 436 (9th Cir. 1995) ...................................................................12

*Galvin v. Hay,*
   374 F.3d 739 (9th Cir. 2004) .................................................................19

*Garcia v. Cnty. of Alameda,*
   150 F.4th 1224 (9th Cir. 2025) ...........................................................3, 6

*Glik v. Cunniffe,*
   655 F.3d 78 (1st Cir. 2011) .....................................................................7

*Goyette v. City of Minneapolis,*
   338 F.R.D. 109 (D. Minn. 2021) ..................................................... 10, 13

*Iacobucci v. Boulter*,
　193 F.3d 14 (1st Cir. 1999) .................................................................10

*Index Newspapers LLC v. City of Portland*,
　480 F. Supp. 3d 1120 (D. Or. 2020),
　*aff'd*, 977 F.3d 817 (9th Cir. 2020) ....................................................13

*Index Newspapers LLC v. U.S. Marshals Serv.*,
　977 F.3d 817 (9th Cir. 2020).......................................................... passim

*Jacobson v. United States Dep't of Homeland Sec.*,
　882 F.3d 878 (9th Cir. 2018) ...............................................................11

*Jordan v. Adams Cnty. Sheriff's Off.*,
　73 F.4th 1162 (10th Cir. 2023) ...........................................................7

*Kuba v. 1-A Agric. Ass'n*,
　387 F.3d 850 (9th Cir. 2004)..............................................................12

*Leigh v. Salazar*,
　677 F.3d 892 (9th Cir. 2012) ......................................................... passim

*Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018),
　*amended and superseded on denial of reh'g en banc*,
　920 F.3d 584 (9th Cir. 2019)................................................................8

*Martinez v. City of Fresno*,
　No. 1:22-cv-00307, 2022 WL 1645549 (E.D. Cal. May 24, 2022) ...................13

*McCullen v. Coakley*,
　573 U.S. 464 (2014) ...................................................................... 4, 10

*Meyers v. City of New York*,
　812 F. App'x 11 (2d Cir. 2020)...........................................................12

*Mills v. Alabama*,
　384 U.S. 214 (1966) ......................................................................3, 7

*Packingham v. North Carolina*,
　582 U.S. 98 (2017) ...........................................................................9

*People for the Ethical Treatment of Animals, Inc. v. N.C. Farm
　Bureau Fed'n, Inc.*, 60 F.4th 815 (4th Cir. 2023) ................................14

*Reed v. Lieurance,*
  863 F.3d 1196 (9th Cir. 2017) ............................................... 4, 5, 12, 18

*Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) ........................................................................3, 9

*Safari Club Int'l v. Rudolph,*
  862 F.3d 1113 (9th Cir. 2017) .................................................................7

*Schenck v. Pro-Choice Network of W. N.Y.,*
  19 U.S. 357 (1997) ...............................................................................19

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) .............................................................................19

*United States v. Sherman,*
  581 F.2d 1358 (9th Cir. 1978) ................................................................7

*United States v. Grace,*
  461 U.S. 171 (1983) ............................................................................11

*United States v. Stevens,*
  559 U.S. 460 (2010) ............................................................................11

**Statutes**

Ark. Code Ann. § 5-71-206 (2024) ...........................................................15

Cal. Penal Code § 409.5(d) (2024) ..........................................................15

**Other Authorities**

Alex Zielinski, *How New Multnomah County Data Explains the Region's
  Homelessness Crisis*, Or. Pub. Broad. (Apr. 16, 2025),
  https://tinyurl.com/mtr6en7s ..................................................................8

Brenna Visser, *Bend Homeless Camp Cleanup Draws Criticism*, The Bulletin
  (Mar. 11, 2021), https://tinyurl.com/mvy7jwpa ......................................8

*'Fight for the Soul of Seattle': Program Looks at Effects of City's Permissive
  Posture*, KOMO News (Dec. 14, 2020),
  https://tinyurl.com/yc28tdnh ..................................................................8

Intradepartmental Correspondence from Michel Moore, Chief of Police, to the
    Board of Police Commissioners (Dec. 8, 2021),
    https://www.lapdpolicecom.lacity.org/121421/BPC_21-233.pdf ........................16

Megan Cardona, *Tiny Homes in the Big D? Dallas Explores Options to Address
    Homelessness*, KERA News (Oct. 8, 2025),
    https://tinyurl.com/fkrhcayx ................................................................................8

Nat'l Advisory Comm'n on Civil Disorders, *Report of the National Advisory
    Commission on Civil Disorders* (1968),
    https://tinyurl.com/yux2p8ys ..............................................................................15

Nathan Heller, *It's Too Early to Give Up on Homelessness in America*, New
    Yorker (July 31, 2024),
    https://tinyurl.com/3ny28ydr ...............................................................................8

Police Exec. Rsch. F., *Police-Media Interactions During Mass Demonstrations:
    Practical, Actionable Recommendations* (2024),
    https://portal.cops.usdoj.gov/resourcecenter/content.ashx?cops-r1167-pub.pdf. .16

*Reporters Committee Tracks Curfew Orders in Wake of Nationwide Protests*,
    Reps. Comm. for Freedom of the Press (June 1, 2020),
    https://tinyurl.com/3zja8m6h ..............................................................................15

*Standards & Values*, Reuters,
    https://tinyurl.com/3s2s7ca7 (last accessed Aug. 28, 2025) ...............................14

Stephen Eide, *The Federal Government Is Making Homelessness Worse*, Nat'l
    Rev. (Dec. 17, 2024),
    https://tinyurl.com/5d6xh3wp ...............................................................................8

Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*,
    44 Stan. L. Rev. 927 (1992) ................................................................................17

William Powell, Jordan Murov-Goodman & Lyndsey Wajert, *Special Analysis:
    Explicit Press Protections In State and Territorial Emergency Laws*, Reps.
    Comm. for Freedom of the Press (Apr. 16, 2020),
    https://tinyurl.com/4x45cpem ..............................................................................15

## SOURCE OF AUTHORITY TO FILE

The Reporters Committee for Freedom of the Press has consent to file this amici curiae brief from Plaintiff-Appellee April Fonseca and Defendants-Appellants James Barringer, Scott Clauson, Brian Sjothun, Steven Furst, Geoffrey Kirkpatrick, Michael Todd, Randal Jewell, and Trevor Arnold (collectively, "Appellants"), and this brief is thus filed pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

The Reporters Committee for Freedom of the Press declares that:

1.  no party's counsel authored the brief in whole or in part;

2.  no party or party's counsel contributed money intended to fund the preparation or submission of the brief; and

3.  no person, other than amici, their members or their counsel, contributed money intended to fund the preparation or submission of the brief.

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"), Advance Publications, Inc., The Atlantic Monthly Group LLC, Axios Media Inc., BuzzFeed, The Center for Investigative Reporting, Cityside, Dow Jones & Co. (The Wall Street Journal), The E.W. Scripps Company, Eugene Weekly, First Amendment Coalition, Gales Creek Journal, KQED, Los Angeles Press Club, The Media Institute, MediaNews Group Inc., National Freedom of Information Coalition, The National Press Club, National Press Photographers Association, National Public Radio, Inc., News in the Grove, News/Media Alliance, The NewsGuild - CWA, Online News Association, Oregon Public Broadcasting, Pro Publica, Inc., The Seattle Times Company, Society of Environmental Journalists, Society of Professional Journalists, Student Press Law Center, and Tully Center for Free Speech (together, "amici").

As news entities and organizations representing the interests of journalists and media outlets actively engaged in newsgathering and reporting in public places, amici have a strong interest in ensuring the press's ability to observe and report on government operations, including the manner in which law enforcement officers enforce dispersal orders.  Amici write to emphasize the importance of government compliance with the Constitution, and this Court's precedent, when carrying out such orders.

Lead amicus the Reporters Committee is an unincorporated nonprofit association.  It was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.  In this and other federal courts, the Reporters Committee frequently serves as amicus curiae in cases involving the appropriate First Amendment framework for when and how law enforcement may restrict press access to public spaces.  *See, e.g.*, Br. of Amici Curiae Reporters Comm. & 60 Media Orgs., *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020) (No. 20-35739, 2020 WL 7063167).  A statement of identity of each amicus organization is set forth in the attached appendix.

## SUMMARY OF THE ARGUMENT

The First Amendment was adopted "to protect the free discussion of governmental affairs," including "the manner in which government is operated or should be operated," and the "Constitution specifically selected the press . . . to play an important role in the discussion" of such public affairs. *Mills v. Alabama*, 384 U.S. 214, 218–19 (1966). This free and informed discussion is possible because journalists act as "'surrogates for the public.'" *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 830 (9th Cir. 2020) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572–73 (1980)). Among the ways the press fills its surrogacy role is by observing, "recording and photographing 'matters of public interest'" such as government operations. *Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1230 (9th Cir. 2025) (citation omitted). Through this reporting, the press provides the public with direct, first-person accounts of how public officials—and especially law enforcement—carry out their responsibilities. This Court has described these "newsgathering activities" as the "'quintessential function of a reporter'" and held time and again that they are "protected by the First Amendment." *Id.* (citation omitted); *accord Leigh v. Salazar*, 677 F.3d 892, 897–98 (9th Cir. 2012) (observing that "newsgathering is an activity protected by the First Amendment," and "the Supreme Court has long recognized a qualified right of access for the press and public to observe government activities").

3

Here, reporter April Fonseca ("Fonseca" or "Appellee") was gathering information in Hawthorne Park before and during the City of Medford's ("the City") operation to clear a homeless encampment there. Public parks are traditional public fora, occupying a "special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (cleaned up). The government's ability to restrict speech in such locations is "very limited." *Id.* at 477 (citation omitted). Practical policy considerations additionally support strict limitations on the government's ability to remove a reporter like Fonseca under these circumstances because, as this Court has previously observed, "excluding the media from public fora can have particularly deleterious effects on the public interest, given journalists'" role as public surrogates. *Index Newspapers LLC*, 977 F.3d at 830. Yet Appellants did exclude Fonseca, directing her to a "staging" area where she would have been unable to see or hear the clearance operation, and they ultimately arrested her for continuing her reporting. The government action here was not "narrowly tailored to serve a significant government interest," nor did it "leave open ample alternative channels for communication" by Fonseca and other reporters, as required under the law. *Reed v. Lieurance*, 863 F.3d 1196, 1211 (9th Cir. 2017). Appellants disregarded the First Amendment's protections both for

newsgathering and for public fora, and the District Court below was correct when it held that Fonseca's § 1983 claims could proceed.

Appellants challenge that decision on appeal by asserting that Hawthorne Park "was a closed location, not a public forum" at the time of Fonseca's arrest. Appellants' Br. at 15. But Appellants' argument ignores that the closure and order as carried out here must still comply with the First Amendment and this Court's precedent. Constitutional safeguards for the press's ability to report on government operations cannot be disregarded because officials see them as inconvenient or would prefer to carry out enforcement actions away from public view. The City's closure order (and Appellants' enforcement thereof) restrained Fonseca's newsgathering, sought to bar her from access to a traditional public forum, and removed her from a place where she could reasonably observe and report, implicating her First Amendment rights. As such, Appellants' actions must be evaluated under the test for time, place, and manner restrictions laid out by this Court in *Reed* and its progeny—not the rational-basis test proposed by Appellants. To do otherwise would render First Amendment protections toothless for Fonseca and other journalists and fall far short of the "thorough and searching review of any attempt to restrict public access" that the Constitution requires. *Leigh*, 677 F.3d at 900. Under this analysis, Fonseca raised a dispute of material fact as to whether her clearly established First Amendment rights were violated, and

5

Appellants' motion for summary judgment was properly denied. The District Court's decision should be affirmed.

## ARGUMENT

### I. The First Amendment protects the right of the press and public to document government operations, including encampment sweeps in parks.

The District Court properly found that "[t]he First Amendment protects the right to observe and record, just as it protects the right to publish information," and that "[t]hose protections are at their strongest in a city park, a traditional public forum." ER-10 (Op. at 7). Appellants seek to challenge the decision on the basis that city officials had ordered Hawthorne Park "closed to the public," arguing that this order meant Fonseca was no longer "engaged in the expression of speech" when she entered the park to report on the encampment sweep. Appellants' Br. at 22. Not so. The City's issuance of an improperly tailored order closing the park to the press and public does not diminish the protections for Fonseca's newsgathering; the First Amendment does not permit the issuance and enforcement of an overbroad closure order in the first place.

When Fonseca recorded members of the Medford Police Department interacting with individuals living in Hawthorne Park, she was performing one of the core functions that the Constitution assigns the press. *See Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1230 (9th Cir. 2025) (describing on-the-ground

observation and recording as part of the "'quintessential function of a reporter'" (quoting *Safari Club Int'l v. Rudolph*, 862 F.3d 1113, 1125 (9th Cir. 2017)). "[N]ewsgathering is an activity protected by the First Amendment." *Id.* (quoting *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978); *Leigh*, 677 F.3d at 897 (same). That right encompasses "the right to photograph and record matters of public interest," including officials "engaged in the exercise of their official duties in public spaces." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). As courts have recognized, "[g]athering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the 'free discussion of governmental affairs.'" *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). And that openness "not only aids in the uncovering of abuses . . . but also may have a salutary effect on the functioning of government more generally." *Id.* at 82–83; *see also Jordan v. Adams Cnty. Sheriff's Off.*, 73 F.4th 1162, 1170 (10th Cir. 2023) ("If police could stop criticism or filming by asking onlookers to leave, then this would allow the government to simply proceed upstream and dam the source of speech" and thus "bypass the Constitution.") (cleaned up)).

Those principles squarely apply here, where Fonseca was in the park to report for an Oregon public radio station on the homeless encampment there and

law enforcement's attempt to "sweep" it. Homelessness in the United States and the management of public land on which unhoused individuals live are subjects of legitimate and intense public interest and debate. *See, e.g.*, Alex Zielinski, *How New Multnomah County Data Explains the Region's Homelessness Crisis*, Or. Pub. Broad. (Apr. 16, 2025), https://tinyurl.com/mtr6en7s; Megan Cardona, *Tiny Homes in the Big D? Dallas Explores Options to Address Homelessness*, KERA News (Oct. 8, 2025), https://tinyurl.com/fkrhcayx; *'Fight for the Soul of Seattle': Program Looks at Effects of City's Permissive Posture*, KOMO News (Dec. 14, 2020), https://tinyurl.com/yc28tdnh; Nathan Heller, *It's Too Early to Give Up on Homelessness in America*, New Yorker (July 31, 2024), https://tinyurl.com/3ny28ydr; Stephen Eide, *The Federal Government Is Making Homelessness Worse*, Nat'l Rev. (Dec. 17, 2024), https://tinyurl.com/5d6xh3wp. And the City's physical eviction of such persons implicates practical, policy, and legal questions, potentially including the constitutional rights of unhoused persons.[1] By directly observing and reporting, the press ensures that government

---

[1]     *See* Brenna Visser, *Bend Homeless Camp Cleanup Draws Criticism*, The Bulletin (Mar. 11, 2021), https://tinyurl.com/mvy7jwpa; *see also Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018), *amended and superseded on denial of reh'g en banc*, 920 F.3d 584, 617 (9th Cir. 2019) (holding that the Eighth Amendment

policies and practices are known to the public, crucial for an informed citizenry in our system of government, and that enforcement of government orders is "carried out 'fairly to all concerned.'" *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980)).[2]

Appellants seek to sidestep judicial scrutiny by arguing that the First Amendment's application does not turn on what Fonseca was doing in the park (that is, reporting on an important matter of public concern), but on whether she had any right to access the park at all. *See* Appellants' Br. at 23. But that argument ignores longstanding public forum doctrine. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Hawthorne Park is and was a traditional

---

prohibits punishing "conduct that is an unavoidable consequence of being homeless").

[2]     Amici filing in support of Appellants urge that homeless encampments have become problematic along the West Coast and cities must be able to respond. *See* Br. of Amici Curiae League of Oregon Cities, City of Springfield, and City of Klamath Falls In Support of Defendants-Appellants' Opening Brief Seeking Reversal, Docket No. 17.1, at 7 ("Clean-up of encampments in public spaces is itself an urgent and complex public health issue."); *see also* Appellants' Br. at 26–30. Media amici take no position on these policy questions and write only to emphasize that any restriction on the press's ability to report on how the government responds to these issues must comport with the First Amendment.

public forum. *See id.* ("[A] park is a quintessential forum for the exercise of First Amendment rights."). Any restriction on access to those traditional public fora is thus "subject to First Amendment scrutiny," even where it "says nothing about speech on its face." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). Restrictions on reporters' access to those spaces is no exception. *Index Newspapers*, 977 F.3d at 830 (holding that "excluding the media from public fora" did not comport with First Amendment requirements). Well-settled law thus places limits on the ability of the City and its officers to infringe on speech and expression, including through orders to disperse the press and the public from public parks.[3] *See, e.g.*, *Index Newspapers*, 977 F.3d at 831 (press had First Amendment right of access that limited government's ability to disperse them); *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 116 (D. Minn. 2021) (same); *see also Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010) (finding that First Amendment prohibited City of Hermosa Beach, California, from enforcing ordinance that overly restricted expressive activity).

---

[3] Appellants also contend that "[e]ach of the Individual Defendants was entitled to believe that the authority they acted pursuant to was constitutional," Appellants' Br. at 34, and so can evade liability because they were following the unconstitutional closure order. But "[a] police officer is not a law unto himself; he cannot give an order that has no colorable legal basis and then arrest a person who defies it." *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999).

Hawthorne Park did not cease to become a public forum because city officials issued a closure order. *See Jacobson v. United States Dep't of Homeland Sec.*, 882 F.3d 878, 882–83 (9th Cir. 2018) (noting that "the destruction of public forum status . . . is at least presumptively impermissible," and "the government bears the burden of showing" that an area's status has changed); *United States v. Grace*, 461 U.S. 171, 180 (1983) (stating that government "may not by its own *ipse dixit* destroy the public forum status of streets and parks which have historically been public forums") (cleaned up). If it did, and a forum's status could be determined by the whims of government actors without reference to the broader use, history, and context, the public forum doctrine would become a nullity. That possibility would give the government heretofore unknown "freewheeling authority" to decide when, where, and what kind of speech is permitted. *See United States v. Stevens*, 559 U.S. 460, 469–72 (2010) (rejecting argument that content-based speech restriction was in a "'First Amendment Free Zone'" not subject to constitutional scrutiny because of government's interest in curbing that content) (citation omitted). The District Court rightly rejected Appellants' request to grant it this authority.

II.  **Constitutional scrutiny is essential to protect the rights of the press, and the District Court's analysis was the correct one.**

  A.  **The First Amendment demands that Appellants narrowly tailor restrictions on newsgathering and leave open ample alternative channels for reporting.**

Because the City's closure order impeded newsgathering and Fonseca was engaged in activity protected by the First Amendment when she was arrested, Appellants' conduct is subject to a higher degree of scrutiny than the rational-basis analysis they propose.  The District Court engaged in the correct analysis when it found that Appellants' actions violated the First Amendment.  Even where the government restricts only the time, place, or manner by which the press may gather and report the news, those restrictions must be "narrowly tailored" to advance "a significant government interest" and must "leave open ample alternative channels for communication of the information."  ER-11 (Op. at 8) (describing any "[c]ontent-neutral restriction of First Amendment protected activity in a public forum" to be subject to these two requirements, "sometimes known as the 'reasonable time, place, and manner' test") (citing *Reed*, 863 F.3d at 1211).  In so holding, the District Court correctly applied this Court's instruction in *Reed* that the time, place, and manner framework is the proper analysis for a "restriction[] on expressive activity in a public forum," including the "the First Amendment-protected activity of observing a government operation."  863 F.3d at 1211 (citing

*Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995), and *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 858 (9th Cir. 2004)).

Even in *Meyers v. City of New York*, cited by Appellants, the Second Circuit applied this test to the plaintiffs' First Amendment claim. 812 F. App'x 11, 15 (2d Cir. 2020). The plaintiffs in *Meyers* were not journalists, but rather 150 Occupy Wall Street protesters who had blocked and refused to leave a public space and later alleged First Amendment retaliation and discrimination. 812 F. App'x at *14–16. On those facts, the court found that the dispersal of protesters was narrowly tailored, served a significant government interest, and that alternative channels of communication existed. *Id.* In other words, the *application* of the time, place, and manner test in *Meyers* supports Appellee's argument, even if the *outcome* differed based on the specific facts of that case. Thus, as the law currently stands, in the Ninth Circuit and elsewhere, a "court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Leigh*, 677 F.3d at 900. The District Court declined to be that rubber-stamp and applied the proper test under this Court's long-standing precedent.

### B. Appellants' proposed rational-basis test would eviscerate the press's ability to cover newsworthy events in public places.

Appellants' proposal to evade constitutional scrutiny and apply a rational-basis test here would be disastrous for newsgathering in circumstances well beyond the reporting on homeless encampment sweeps in Medford, Oregon. Journalists

directly observe a wide range of newsworthy events in public places subject to access restrictions. They do so at events as diverse as protests, horse round-ups, and abatement activities—all to document and report what the government is doing. *See, e.g.*, *Leigh*, 677 F.3d at 900; *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1146, 1155–56 (D. Or. 2020), *aff'd*, 977 F.3d 817 (9th Cir. 2020); *Martinez v. City of Fresno*, No. 1:22-cv-00307, 2022 WL 1645549 (E.D. Cal. May 24, 2022); *Goyette v. City of Minneapolis*, 338 F.R.D. 109 (D. Minn. 2021). Were the Constitution to require that a government order need be only "rationally related" to a "legitimate government interest" for the government to restrict the press's First Amendment right to report, as Appellants argue, government entities would have significant discretion to restrict what the press is able to uncover and, therefore, what the public knows about their operations. It would represent an abdication of the courts' "duty to conduct a thorough and searching review of any attempt to restrict public access." *Leigh*, 677 F.3d at 900.

Journalists reporting on government action on the ground are serving a fundamental democratic purpose. "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975); *see also People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*,

60 F.4th 815, 829 (4th Cir. 2023) ("First-hand accounts, buttressed by video evidence, enhance accuracy and credibility in reporting and increase transparency and reader trust, allowing the press to tell more complete and powerful stories." (cleaned up)); *Standards & Values*, Reuters, https://tinyurl.com/3s2s7ca7 (last accessed Aug. 28, 2025) ("A Reuters journalist or camera is generally the best source on a witnessed event.").

When journalists are not present and the official narrative of important incidents is the only one available, the public suffers. For example, the Kerner Commission, empaneled by President Johnson to study unrest in the 1960s, found that the government's control over information about the riots of that era had misled the public about the extent of violence. *See* Nat'l Advisory Comm'n on Civil Disorders, *Report of the National Advisory Commission on Civil Disorders* at 202 (1968), https://tinyurl.com/yux2p8ys (noting that official estimates left "an indelible impression of damage up to more than 10 times greater than actually occurred"). Across the board, where reporters were forced to rely on "police and city officials [as] their main—and sometimes their only—source of information," coverage was skewed in favor of those sources. *Id.* at 207. The Commission concluded that "more first-hand reporting" across the area where riots took place could have "temper[ed] easy reliance on police information and announcements," *id.*, to better inform the public and promote accountability.

15

For just that reason, many states and cities take care to ensure press access to newsworthy public events. For example, certain local ordinances and orders exempt reporters from otherwise-applicable emergency regulations. *See, e.g.*, *Reporters Committee Tracks Curfew Orders in Wake of Nationwide Protests*, Reporters Comm. for Freedom of the Press (June 1, 2020), https://tinyurl.com/3zja8m6h (curfew orders); Cal. Penal Code § 409.5(d) (natural disaster restrictions); Ark. Code Ann. § 5-71-206 (dispersal orders); William Powell, Jordan Murov-Goodman & Lyndsey Wajert, *Special Analysis: Explicit Press Protections In State and Territorial Emergency Laws*, Reps. Comm. for Freedom of the Press (Apr. 16, 2020), https://tinyurl.com/4x45cpem (emergency management laws); *see also*, Intradepartmental Correspondence from Michel Moore, Chief of Police, to the Board of Police Commissioners (Dec. 8, 2021), https://www.lapdpolicecom.lacity.org/121421/BPC_21-233.pdf (Los Angeles City Police broadening access for journalists covering mass demonstrations). And this Court has held—and the Department of Justice in a 2024 report agreed—that police dispersal orders are not narrowly tailored where they fail to preserve access to a public protest for non-obstructive journalists. *See Index Newspapers LLC*, 977 F.3d at 833–34 (finding police dispersal orders not narrowly tailored because government failed "to show that the dispersal of press was essential"); Police Executive Res. Forum, *Police-Media Interactions During Mass Demonstrations:*

16

*Practical, Actionable Recommendations*, at 7 (2024),

https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-r1167-pub.pdf.

("[T]here may be situations . . . where the police may reasonably limit public access.  In these circumstances, to ensure that these limitations are narrowly tailored, the police may need to exempt reporters from these restrictions.").  As courts and many government bodies have rightly recognized, without reporters on the scene, the public's understanding of a whole range of consequential government activities would be incomplete.

Conversely, a government entity or officials might seek to *avoid* public scrutiny were they more easily able to exclude the press.  "When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate."  *Leigh*, 677 F.3d at 900; *see also id.* ("[W]hen the government announces it is excluding the press for reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real motive may be to prevent the gathering of information about government abuses or incompetence.") (quoting Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 949 (1992)).  If officials give in to that temptation—perhaps by issuing an overbroad closure order and arresting reporters covering police activity in a public park—"the media's only recourse is the court system." *Id.*  Rational-basis review in these circumstances would leave the news

17

media with virtually no recourse in practice and would undermine decades of precedent protecting journalists' ability to gather the news.

### C. Appellants' actions were not tailored to a significant government interest and failed to leave open alternative channels for reporting on the sweep.

Applying any level of review above rational basis, as the District Court did and this Court must, Appellants' actions plainly violate the First Amendment. Beginning with its purportedly "significant government interest," the City's closure order consisted of a single sentence stating that "the City Manager has ordered the closure of Hawthorne Park for at least 48 hours to allow for the sanitation, cleaning, and inspection of City property," without any explanation as to why the presence of the press would impede the park's sanitation, cleaning, or inspection.  *See* Supplemental ER 030-31 (Dkt. 29.1); ER-11-12 (Op. at 8–9).  The District Court's analysis was exactly right on this point when it emphasized that Appellants "presented no evidence of any critical health or safety concerns justifying the wholesale exclusion of reporters and observers.  If a volatile situation were to arise, Defendants had alternative means to respond."  ER-13 (Op. at 10).

Worse, there is evidence to suggest that officers' concerns about being recorded by the media were part of their motivation to keep reporters out of the park.  *See* ER-14 (Op. at 11) ("[S]tatements made by officers at the park raise a question of fact as to whether health and safety concerns were the real reason

reporters were excluded from the park.").  And that is not a legitimate interest, let alone a significant one, as "public officials have no general privilege to avoid publicity and embarrassment by preventing public scrutiny of their actions." *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (internal quotation omitted).  Where, as here, the government has no "genuine safety or operational reason" to close off a park to journalists, *Reed*, 863 F.3d at 1212, it cannot bar the press from performing its core constitutional function of observing and reporting on government action live and in person.

Further, by expelling Fonseca and any other reporters, Appellants failed to leave open any "reasonable alternative" means of documenting the City's operations, let alone "ample" alternative means.  *Reed*, 863 F.3d at 1212 (internal quotation omitted).  Because "[t]he First Amendment protects the right to photograph and record matters of public interest," *Askins*, 899 F.3d at 1044, it necessarily must protect the right of access to both sights and sounds, *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."); *Brown v. Kemp*, 86 F.4th 745, 779 (7th Cir. 2023) (holding that "visual or physical proximity" and "approaching" a subject of news were protected activities because they are "essential to carry out plaintiffs' protected monitoring and recording"); *Chestnut*, 947 F.3d at 1090 (noting observation is "a necessary prerequisite to

recording"); *First Amend. Coal. v. Ryan*, 938 F.3d 1069, 1075 (9th Cir. 2019)

("[T]he First Amendment right of access to governmental proceedings

encompasses a right to hear the sounds of executions in their entirety.").

Here, the "staging area" to which Appellants attempted to confine Fonseca

"was approximately 208 feet from the center of the park encampment, while the

perimeter sidewalks were as much as 257 feet from the center of the encampment."

ER-14 (Op. at 11).  That is obviously too far from the park to record audio or video

of interactions between law enforcement and individuals living there.  *Id.*; *cf.*

*Galvin v. Hay*, 374 F.3d 739, 749 (9th Cir. 2004) (rejecting buffer zone of 75 yards

as insufficient); *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377–80

(1997) (rejecting buffer zone of 15 feet as insufficient); *Berger v. City of Seattle*,

569 F.3d 1029, 1056 (9th Cir. 2009) (rejecting buffer zone of 30 feet as

insufficient); *Ariz. Broads. Ass'n v. Brnovich*, 626 F. Supp. 3d 1102, 1106 (D.

Ariz. 2022) (rejecting buffer zone of 8 feet as insufficient).  The ability to observe

the encampment clearance from any closer was prohibited by the closure order,

resulting in Fonseca's arrest when she sought to continue to meaningfully and

effectively cover the sweep.  In other words, Appellants left open no avenue for

Fonseca and other journalists to observe and record the action.  The Constitution

condemns that result.

## CONCLUSION

For the foregoing reasons, amici respectfully urge this Court to affirm the decision below, denying Appellants' motion for summary judgment and permitting Fonseca's First Amendment claims to proceed.

Date: November 10, 2025

Respectfully submitted,

/s/ *Gabriel Rottman*
Gabriel Rottman
    *Counsel of Record*
Mara Gassmann*
Grayson Clary
Renee M. Griffin*
THE REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Phone: (202) 795-9300
Fax: (202) 795-9310
        *Of counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2025, I caused the foregoing Brief of Amici Curiae the Reporters Committee for Freedom of the Press and 30 News and Media Organizations to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notices of such filing to all counsel of record.

/s/*Gabriel Rottman*
Gabriel Rottman
*Counsel of Record for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** No. 25-2618

I am the attorney for *amicus curiae* the Reporters Committee for Freedom of the Press.

**This brief contains 4,626 words,** excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

> [  ] it is a joint brief submitted by separately represented parties;
> [  ] a party or parties are filing a single brief in response to multiple briefs; or
> [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/Gabriel Rottman*          **Date:** November 10, 2025

23

## ADDENDUM: STATEMENTS OF INTEREST OF AMICI CURIAE

Advance Publications, Inc. is a diversified privately-held company that operates and invests in a broad range of media, communications and technology businesses. Its operating businesses include Conde Nast's global magazine and digital brand portfolio, including titles such as Vogue, Vanity Fair, The New Yorker, Wired, and GQ, local news media companies producing newspapers and digital properties in 10 different metro areas and states, and American City Business Journals, publisher of business journals in over 40 cities.

The Atlantic Monthly Group LLC is the publisher of The Atlantic and TheAtlantic.com. Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, The Atlantic continues its 160-year tradition of publishing award-winning journalism that challenges assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

Axios Media Inc. is a digital media company with a mission to deliver news in an efficient format that helps professionals get smarter faster across an array of topics, including politics, science, business, health, tech, media, and local news.

BuzzFeed, Inc. is a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

The Center for Investigative Reporting, Inc. is the nation's oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios. Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance. Reveal produces investigative journalism for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels. Reveal often works in collaboration with other newsrooms across the country.

Cityside is a nonpartisan, nonprofit media organization committed to building community through local journalism. Cityside publishes Berkeleyside and The Oaklandside, two of the leading independent, online news sites in the country.

Dow Jones & Company is the world's leading provider of news and business information. Through The Wall Street Journal, Barron's, MarketWatch, Dow Jones Newswires, and its other publications, Dow Jones has produced journalism of unrivaled quality for more than 130 years and today has one of the world's largest newsgathering operations. Dow Jones's professional information services, including the Factiva news database and Dow Jones Risk & Compliance, ensure that businesses worldwide have the data and facts they need to make intelligent decisions. Dow Jones is a News Corp company.

The E.W. Scripps Company is the nation's fourth-largest local TV broadcaster, operating a portfolio of 61 stations in 41 markets. Scripps also owns Scripps Networks, which reaches nearly every American through the national news outlets Court TV and Newsy and popular entertainment brands ION, Bounce, Grit, Laff and Court TV Mystery. The company also runs an award-winning investigative reporting newsroom in Washington, D.C., and is the longtime steward of the Scripps National Spelling Bee.

Eugene Weekly, locally owned since 1982, is an alternative news weekly covering news, arts and entertainment in Lane County, Oregon. EW focuses on investigative and solutions journalism that affect the community and the state.

First Amendment Coalition (FAC) is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose by working to improve governmental compliance with state and federal open government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work. FAC's members are news

organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

The Gales Creek Journal (formally, Gales Creek Journal LLC) is a news organization headquartered in Gales Creek, Oregon. It publishes the Gales Creek Journal, the Banks Post, and the Salmonberry Magazine.

KQED Inc. is a nonprofit public benefit corporation organized under the laws of California and engaged in dissemination of news and information since its founding as a public broadcasting station in 1953. At all times relevant to this proceeding, KQED's core mission has been the pursuit and publication/broadcast of information in the public's interest. KQED has advanced this purpose not only through its consistent San Francisco Bay Area and statewide news reporting, which relies heavily on the use of the California Public Records Act, but also as a champion of public access to some of the most serious information maintained by government: law enforcement use of deadly force, police misconduct and the broader operations of our state's criminal justice system.

The Los Angeles Press Club is a 501(c)(3) nonprofit with over 1,000 member journalists. Established in the early 1900s and incorporated in 1948, the organization's mission is to support, promote and defend quality journalism in Southern California. LAPC serves journalists working in any medium (print, digital, broadcast or otherwise), including freelancers and students.

The Media Institute is a nonprofit foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

MediaNews Group is a leader in local, multi-platform news and information, distinguished by its award-winning original content and high quality local media. It is one of the largest news organizations in the United States, with print and online publications across the country.

The National Freedom of Information Coalition is a national nonprofit, nonpartisan organization of state and regional affiliates representing 45 states and the District of Columbia. Through its programs and services and national member network, NFOIC promotes press freedom, litigation and legislative and administrative reforms that ensure open, transparent and accessible state and local governments and public institutions.

The National Press Club is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club

holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

National Public Radio, Inc. (NPR) is a non-profit multimedia organization and the leading provider of non-commercial news, information, and entertainment programming to the American public. NPR's fact-based, independent journalism helps the public stay on top of breaking news, follow the most critical stories of the day, and track complex issues over the long term. NPR reaches approximately 60 million people each week on broadcast radio, podcasts, NPR apps, NPR.org, and YouTube video content. NPR distributes its radio broadcasts through more than 1,000 non-commercial, independently operated radio stations, licensed to more than 260 NPR members and numerous other NPR-affiliated entities.

News in the Grove is a news organization headquartered in Forest Grove, Oregon. In partnership with the Gales Creek Journal, it publishes news in western Washington County.

The News/Media Alliance represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. The Alliance diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

The News Guild-CWA is a labor organization representing more than 25,000 employees of newspapers, newsmagazines, news services and other media enterprises. Guild representation comprises, in the main, the editorial and online departments of these media outlets. The News Guild is a sector of the Communications Workers of America. CWA is America's largest communications and media union, representing over 500,000 men and women in both private and public sectors.

The Online News Association is the world's largest association of digital journalists. ONA's mission is to inspire innovation and excellence among

journalists to better serve the public. Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems. ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

Oregon Public Broadcasting (OPB) is a nationally-recognized leader in public media, reaching 1.5 million people across Oregon and southwest Washington each week through its network of television and radio stations, and robust online programming. With award-winning journalists and original series, OPB's mission is to illuminate the people, places, and issues of the region and put stories into context.

Pro Publica, Inc. ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer

Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Seattle Times Company, locally owned since 1896, publishes the daily newspaper The Seattle Times, together with the Yakima Herald-Republic and Walla Walla Union-Bulletin, all in Washington state.

The Society of Environmental Journalists is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism.  It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior.  Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry,

works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

Student Press Law Center ("SPLC") is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States. SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.