No. 25-2618

IN THE

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

————

**April Fonseca**, aka **April Ehrlich**,

*Plaintiff-Appellee*,

*v.*

**James Barringer**, **Scott Clauson**, **Brian Sjothun**, **Steven Furst**, **Trevor Arnold**, **Michael Todd**, **Geoffrey Kirkpatrick**, and **Randal Jewell**,

*Defendants-Appellants.*

————

On appeal from the United States District Court
for the District of Oregon
Case No. 1:22-cv-1416-CL
Hon. Mark D. Clarke

---

# BRIEF OF AMICI CURIAE PUBLIC ACCOUNTABILITY AND PUBLIC JUSTICE SUPPORTING PLAINTIFF AND AFFIRMANCE

---

Athul K. Acharya
Sara K. Rosenburg
PUBLIC ACCOUNTABILITY
P.O. Box 14672
Portland, Oregon 97293
(503) 383-9492

November 10, 2025          *Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Neither Public Accountability nor Public Justice have any parent corporation.  No publicly held corporation owns 10 percent or more of Public Accountability's or Public Justice's stock.

# TABLE OF CONTENTS

Interest of Amici Curiae ....................................................................1

Introduction .......................................................................................2

Argument ...........................................................................................4

1.  The collateral-order doctrine was a mistake—an atextual,
    unworkable exception to Congress's final-judgment rule. ...........4

2.  Qualified immunity was a mistake—an atextual, unworkable
    exception to Congress's civil-rights remedy.................................8

    2.1.  Qualified immunity conflicts with the original text,
          history, and purpose of Section 1983. ...............................8

    2.2.  Qualified immunity has been roundly criticized...............12

    2.3.  The Supreme Court has begun trimming the doctrine's
          harshest excesses. ...........................................................14

3.  Combining the collateral-order doctrine with qualified
    immunity compounded the flaws of both, so the Supreme
    Court has since sharply limited such appeals. ...........................17

    3.1.  Allowing collateral-order review of qualified-immunity
          denials flooded the courts with appeals like this one. ........17

    3.2.  In response, the Supreme Court limited such appeals to
          cases presenting "neat abstract issues of law." ..................19

    3.3.  When an official makes factbound arguments on
          interlocutory review, the proper course is to dismiss the
          appeal. ...........................................................................22

4.  The officials' argument here depends on their view of the facts,
    so this Court should dismiss their appeal. .................................23

Conclusion .......................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Ames v. King Cnty.*,
   846 F.3d 340 (9th Cir. 2017) ........................................................ 21

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................. 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................ 5, 17

*Baxter v. Bracey*,
   140 S. Ct. 1862 (2020) ............................................................... 13

*Behrens v. Pelletier*,
   516 U.S. 299 (1996) .................................................................. 20

*Browder v. City of Albuquerque*,
   787 F.3d 1076 (10th Cir. 2015) ..................................................... 13

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541 (1949) ..................................................... 5, 7, 17, 18

*Conatser v. N. Las Vegas Police Dep't*,
   445 F. App'x 932 (9th Cir. 2011) ................................................... 22

*Coopers & Lybrand v. Livesay*,
   437 U.S. 463 (1978) ........................................................ 5, 17, 18

*Cope v. Cogdill*,
   3 F.4th 198 (5th Cir. 2021) ......................................................... 15

*Cox v. Wilson*,
   971 F.3d 1159 (10th Cir. 2020) ..................................................... 14

*Crawford-El v. Britton*,
   523 U.S. 574 (1998) .................................................................. 13

*Cunningham v. Hamilton Cnty.,*
    527 U.S. 198 (1999) ........................................................ 4

*Digital Equip. Corp. v. Desktop Direct, Inc.,*
    511 U.S. 863 (1994) .............................................. 2, 5, 6

*Dobbs v. Jackson Women's Health Org.,*
    597 U.S. 215 (2022) ................................................. 7, 11

*Est. of Anderson v. Marsh,*
    985 F.3d 726 (9th Cir. 2021) ........................................ 23

*Evans v. Skolnik,*
    997 F.3d 1060 (9th Cir. 2021) ....................................... 12

*Filarsky v. Delia,*
    566 U.S. 377 (2012) ........................................................ 8

*Finley v. Huss,*
    102 F.4th 789 (6th Cir. 2024) ....................................... 16

*George v. Morris,*
    736 F.3d 829 (9th Cir. 2013) ................................19, 20, 21, 23–25

*Goffin v. Ashcraft,*
    977 F.3d 687 (8th Cir. 2020) ........................................ 14

*Groh v. Ramirez,*
    540 U.S. 551 (2004) ..................................................... 14

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ..................................................... 11

*Hernandez v. City of San Jose,*
    897 F.3d 1125 (9th Cir. 2018) ....................................... 19

*Hoggard v. Rhodes,*
    141 S. Ct. 2421 (2021) ............................................ 13, 16

*Intervarsity Christian Fellowship/USA v. Univ. of Iowa*,
    5 F.4th 855 (8th Cir. 2021) .......................................................... 16

*Isayeva v. Sacramento Sheriff's Dep't*,
    872 F.3d 938 (9th Cir. 2017) ...................................................... 21

*Jamison v. McClendon*,
    476 F. Supp. 3d 386 (S.D. Miss. 2020) ....................................... 14

*Jefferson v. Lias*,
    21 F.4th 74 (3d Cir. 2021) ........................................................... 14

*Jessop v. City of Fresno*,
    936 F.3d 937 (9th Cir. 2019) ...................................................... 12

*Johnson v. Jones*,
    515 U.S. 304 (1995) ..............................................3, 7, 19–21, 25

*Justiniano v. Walker*,
    986 F.3d 11 (1st Cir. 2021) ......................................................... 14

*Kisela v. Hughes*,
    584 U.S. 100 (2018) .................................................................... 13

*Lauro Lines s.r.l. v. Chasser*,
    490 U.S. 495 (1989) ...................................................................... 6

*Maddox ex rel. D.M. v. City of Sandpoint*,
    732 F. App'x 609 (9th Cir. 2018) ............................................... 22

*Maropulos v. Cnty. of Los Angeles*,
    560 F.3d 974 (9th Cir. 2009) (per curiam) ............................ 22, 25

*McCoy v. Alamu*,
    141 S. Ct. 1364 (2021) (mem.) ................................................... 15

*McCoy v. Alamu*,
    950 F.3d 226 (5th Cir. 2020) ...................................................... 15

*McKinney v. City of Middletown,*
  49 F.4th 730 (2d Cir. 2022) .......................................................... 14

*McLish v. Roff,*
  141 U.S. 661 (1891) ....................................................................... 4

*Mitchell v. Forsyth,*
  472 U.S. 511 (1985) ......................................................... 3, 17, 18

*Mitchum v. Foster,*
  407 U.S. 225 (1972) ..................................................................... 10

*Moderwell v. Cuyahoga Cnty.,*
  997 F.3d 653 (6th Cir. 2021) ....................................................... 15

*Mohawk Indus., Inc. v. Carpenter,*
  558 U.S. 100 (2009) ................................................................... 5, 7

*Negrete v. City of Oakland,*
  46 F.4th 811 (9th Cir. 2022) ......................................................... 6

*NeSmith v. Olsen,*
  808 F. App'x 442 (9th Cir. 2020) ................................................ 22

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982) ....................................................................... 5

*Pauluk v. Savage,*
  836 F.3d 1117 (9th Cir. 2016) ............................................... 21, 22

*Peck v. Montoya,*
  51 F.4th 877 (9th Cir. 2022) ....................................................... 22

*Pierson v. Ray,*
  386 U.S. 547 (1967) ........................................................ 8, 10, 11

*R.A. v. Johnson,*
  36 F.4th 537 (4th Cir. 2022) ....................................................... 14

*Ramirez v. Guadarrama,*
   2 F.4th 506 (5th Cir. 2021) (mem.) ............................................... 15

*Reedy v. Evanson,*
   615 F.3d 197 (3d Cir. 2010) ........................................................ 16

*Reich v. City of Elizabethtown,*
   945 F.3d 968 (6th Cir. 2019) ....................................................... 14

*Rico v. Ducart,*
   980 F.3d 1292 (9th Cir. 2020) ..................................................... 15

*Sampson v. Cnty. of Los Angeles,*
   974 F.3d 1012 (9th Cir. 2020) ..................................................... 13

*Schantz v. DeLoach,*
   2021 WL 4977514 (11th Cir. 2021) ............................................. 14

*Scheuer v. Rhodes,*
   416 U.S. 232 (1974) ................................................................... 11

*Schwartzman v. Valenzuela,*
   846 F.2d 1209 (9th Cir. 1988) ..................................................... 18

*Sell v. United States,*
   539 U.S. 166 (2003) ..................................................................... 5

*Shafer v. Cnty. of Santa Barbara,*
   868 F.3d 1110 (9th Cir. 2017) ..................................................... 18

*Shannon v. Jones,*
   812 F. App'x 501 (9th Cir. 2020) ........................................... 22, 25

*Singh v. City of Phoenix,*
   124 F.4th 746 (9th Cir. 2024) ..................................................... 22

*Swint v. Chambers Cnty. Comm'n,*
   514 U.S. 35 (1995) .................................................................... 6, 7

*Taylor v. Riojas,*
  592 U.S. 7 (2020) ................................................................. 15

*Thompson v. Cope,*
  900 F.3d 414 (7th Cir. 2018) ............................................. 14

*Truman v. Orem City,*
  1 F.4th 1227 (10th Cir. 2021) ........................................... 15

*United States v. Sineneng-Smith,*
  590 U.S. 371 (2020) ........................................... 22, 23, 25

*Villanueva v. California,*
  986 F.3d 1158 (9th Cir. 2021) .......................................... 19

*Villarreal v. Alaniz,*
  145 S. Ct. 368 (2024) (mem.) .......................................... 15

*Villarreal v. City of Laredo,*
  94 F.4th 374 (5th Cir. 2024) ............................................ 15

*Wearry v. Foster,*
  52 F.4th 258 (5th Cir. 2022) ............................................ 16

*West v. City of Caldwell,*
  931 F.3d 978 (9th Cir. 2019) ............................................ 12

*Will v. Hallock,*
  546 U.S. 345 (2006) ..................................................... 5, 7

*Wyatt v. Cole,*
  504 U.S. 158 (1992) .......................................................... 13

*Zadeh v. Robinson,*
  928 F.3d 457 (5th Cir. 2019) ......................................... 2, 14

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017) .......................................................... 13

STATUTES

28 U.S.C. § 1291 ...................................................................4–6, 18

28 U.S.C. § 1292 ............................................................... 6, 7

28 U.S.C. § 158 ................................................................ 6

28 U.S.C. § 2072 ............................................................... 7

42 U.S.C. § 1983 ........................................................2, 8–10, 12, 13

9 U.S.C. § 16 .................................................................. 6

An Act to Enforce the Provisions of the Fourteenth Amendment to
    the Constitution of the United States, and for Other Purposes,
    ch. 22, § 1, 17 Stat. 13 (1871) ........................................ 9

Rev. Stat. § 1979 (1st ed. 1874) ........................................ 10

RULES

Fed. R. Civ. P. 12 ............................................................ 19

Fed. R. Civ. P. 56 ............................................................ 19

ARTICLES

Alexander A. Reinert,
    *Qualified Immunity's Flawed Foundation*,
    111 Cal. L. Rev. 201 (2023)............................................ 2, 9, 10, 14

Carleton M. Crick,
    *The Final Judgment as a Basis for Appeal*,
    41 Yale L.J. 539 (1932)............................................... 4, 7

Will Tress,
    *Lost Laws: What We Can't Find in the U.S. Code*,
    40 Golden Gate U.L. Rev. 129 (2010) .............................. 10

William Baude,
  *Is Qualified Immunity Unlawful?*,
  106 Cal. L. Rev. 45 (2018) ............................................................ 11

**TREATISES**

15A Charles Alan Wright et al.,
  *Federal Practice & Procedure* § 3914.10 (2d ed. 1992) ................. 19

Antonin Scalia & Bryan A. Garner,
  *Reading Law: The Interpretation of Legal Texts* (2012) ................... 10

William W. Buckland,
  *A Text-Book of Roman Law from Augustus to Justinian* (1921) ......... 4

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. III, § 1 ....................................................................... 6

**OTHER AUTHORITIES**

Judicial Conference of the United States,
  *Report of the Federal Courts Study Committee* (1990) ..................... 18

Margaret Wood,
  *The Revised Statutes of the United States: Predecessor to the U.S. Code*,
  Library of Congress Blogs (July 2, 2015) ........................................ 9

# INTEREST OF AMICI CURIAE[1]

Public Accountability is a nonpartisan, nonprofit organization that promotes access to civil justice for people harmed by the government. As part of its mission, Public Accountability has developed deep expertise in the area of qualified immunity and related doctrines. Public Accountability uses its expertise to help individuals, to inform lawmakers, to educate the public, and—through briefs like this one—to advise the courts. Because qualified immunity is an issue presented in this appeal, Public Accountability offers a perspective that will help inform the Court's decision.

Public Justice is a national public interest legal organization that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting corporate and governmental misconduct. Our Access to Justice Project pursues advocacy efforts to remove procedural obstacles that unduly restrict the ability of people whose civil rights have been violated to seek redress for their injuries in the civil court system. These barriers include the imposition of judge-made immunity doctrines like qualified and sovereign immunity. Because Public Justice has a particular interest and extensive experience in preserving access to the civil court system, its perspective may aid the Court.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus and its counsel has made any monetary contributions to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

# INTRODUCTION

This is not an appeal from a final judgment. It's an *interlocutory* appeal. That's unusual: Normally only final judgments can be appealed. But in 1949, the Supreme Court introduced the "collateral order" doctrine, under which some nonfinal orders are deemed "final" for the sake of allowing immediate review. That was probably a mistake: The doctrine has proven unworkable in practice, the Supreme Court has openly come to regret it, and Congress has done its best to render it obsolete. These are all good reasons to treat collateral-order appeals "with skepticism, if not a jaundiced eye."[1]

The collateral order on appeal here is a denial of qualified immunity—and the creation of qualified immunity was definitely a mistake. The Supreme Court borrowed it from state common-law immunities, reasoning that Congress had not explicitly displaced those when it enacted 42 U.S.C. § 1983. Recent scholarship, however, has shown that Congress *did* explicitly abrogate state-law immunities with Section 1983, and qualified immunity exists only because of a scrivener's error.[2] The doctrine has also drawn criticism from scholars and judges across the spectrum for the way it often translates into "unqualified impunity."[3] In response, the

---

[1] *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 873 (1994).

[2] *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 234–38 (2023).

[3] *Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., concurring in part, dissenting in part).

Supreme Court has begun trimming its harshest excesses. That shift should inform how this Court views both jurisdiction and the merits here.

So where does all this leave collateral-order appeals of qualified-immunity denials, which pile mistake upon mistake? They're still allowed—at least, until the Supreme Court overrules *Mitchell v. Forsyth*[4]—but they're narrow. Officer-defendants can invoke interlocutory appellate jurisdiction only over "purely legal" issues, and they must take the facts as the district court found them.[5] If they don't, their appeal should be dismissed—just as this Court has done in countless cases.

And just as it should do here. Despite the interlocutory posture, the officers still dispute key facts, like whether the closure order prohibited journalists from entering the park and whether the order was in fact a "targeted attempt to prevent reporting on the clearance."[6] Applying the summary judgment standard, the district court correctly resolved those disputes in Fonseca's favor. Its evidentiary conclusions bind the officers on interlocutory review. And without their preferred facts, the officers' legal arguments collapse. So their attempt to invoke this Court's interlocutory jurisdiction fails and this Court should dismiss their appeal.

---

[4] 472 U.S. 511 (1985).

[5] *Johnson v. Jones*, 515 U.S. 304, 313, 319 (1995).

[6] ER-14.

# ARGUMENT

## 1. The collateral-order doctrine was a mistake—an atextual, unworkable exception to Congress's final-judgment rule.

When Roman law introduced appellate review, it allowed appeals from interlocutory as well as final orders. Carleton M. Crick, *The Final Judgment as a Basis for Appeal*, 41 Yale L.J. 539, 540–41 (1932). The Romans soon found this liberality "burdensome" and scrapped it. *Id.* By the time of Justinian, "practically all" interlocutory appeals were forbidden. *Id.* at 541 n.7 (quoting William W. Buckland, *A Text-Book of Roman Law from Augustus to Justinian* 665 (1921)).

At common law, the same rule prevailed: "[N]o writ of error could be brought except on a final judgment." *McLish v. Roff*, 141 U.S. 661, 665 (1891). Across the Atlantic, the First Congress enacted this "well settled and ancient rule" into American law with the Judiciary Act of 1789. *Id.*; *Cunningham v. Hamilton Cnty.*, 527 U.S. 198, 203 (1999). Today, the final-judgment rule can be found at 28 U.S.C. § 1291, which vests the courts of appeals with jurisdiction to review "final decisions" of the district courts.

Until 1949, the Supreme Court's decisions reflected the statute's text. But then, in *Cohen v. Beneficial Industrial Loan Corp.*, the Court introduced the collateral-order doctrine, under which some orders that are not final are nevertheless deemed "final" for the sake of allowing

immediate appeal. 337 U.S. 541, 546–47 (1949); *see Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 116 (2009) (opinion of Thomas, J.). At the time, the Court touted the doctrine as a "practical rather than a technical construction" of Section 1291. *Cohen*, 337 U.S. at 546. In fact, it is—in the words of Justice Scalia—an "invent[ion]" for which "[t]he statutory text provides no basis." *Sell v. United States*, 539 U.S. 166, 189 & n.4 (2003) (Scalia, J., dissenting).

In theory, the doctrine comprises three "stringent" elements: A collateral order must (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) "be effectively unreviewable on appeal from a final judgment." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (cleaned up).

In practice, the Supreme Court's application of these elements has been less than consistent. Orders that sound the "death knell" for a case have been deemed "tentative"—even as others that allow a case to proceed are held "conclusive." *Compare Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 & n.11 (1978), *with Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982). A collateral issue must be "completely separate" from the merits—unless it includes the merits. *Compare Will*, 546 U.S. at 349, *with Ashcroft v. Iqbal*, 556 U.S. 662, 672–73 (2009). It must be "effectively unreviewable"—but that just means delaying review would imperil "some particular value of a high order." *Will*, 546 U.S. at 352; *see also Digital Equipment*, 511 U.S. at 878–79.

In other words, deeming an order "collateral" is a policy decision—a choice by the judiciary that some issues are too important to leave to the district courts. Justice Scalia was candid about this. He explained that when a party aggrieved by an interlocutory order must await final judgment before seeking review, that is because "the law does not deem the [asserted] right *important enough*" to vindicate with interlocutory review. *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 502 (1989) (Scalia, J., concurring). Of course, by "the law" he meant "the Court."

The Constitution, however, vests the power to set the lower federal courts' jurisdiction in *Congress*, not the courts. U.S. Const. art. III, § 1; *Negrete v. City of Oakland*, 46 F.4th 811, 816 (9th Cir. 2022). And Congress exercised that power: It decided that courts of appeals should generally review only final judgments. 28 U.S.C. § 1291. Where it thought an exception might make sense, it enacted one. *E.g.*, 28 U.S.C. § 1292(a) (injunctions, receivers, and admiralty); 28 U.S.C. § 158(a) (bankruptcy); 9 U.S.C. § 16(a) (arbitration). To account for unforeseen cases, it allowed ad hoc interlocutory review of "serious legal questions"—but only when both the district court and the court of appeals agree the issue warrants immediate review. 28 U.S.C. § 1292(b); *Digital Equipment*, 511 U.S. at 883; *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995). And if all that weren't enough, Congress did give the Supreme Court the power to designate discrete classes of orders eligible for interlocutory review—but through *rulemaking*, not by judicial fiat.

28 U.S.C. § 1292(e); 28 U.S.C. § 2072(c). In short, Congress carefully laid out when, how, and on whose authority interlocutory review might lie.

The collateral-order doctrine shreds all that.

*Cohen* was a New Deal-era decision. 337 U.S. at 541. The Court has since come to disfavor "freewheeling judicial policymaking." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022). Now, when it mentions the collateral-order doctrine, it emphasizes its "small," "modest," "narrow," and "selective" scope. *Swint*, 514 U.S. at 42; *Will*, 546 U.S. at 350; *Mohawk*, 558 U.S. at 113. And Justice Thomas, at least, has suggested strictly limiting the doctrine—or even scrapping it entirely, much as the Romans did. *Mohawk*, 558 U.S. at 117–19 (opinion of Thomas, J.); *cf.* Crick, 41 Yale L.J. at 540–41.

This Court, of course, can't take that step itself: "Only the Supreme Court has power to reconsider [] New Deal-era precedent—perhaps reaffirming it, overruling it, or narrowing it—and at least so far, it hasn't." *Consumers' Rsch. v. C.P.S.C.*, 91 F.4th 342, 356 (5th Cir. 2024). But this Court can and should take the Supreme Court at its word, and treat the collateral-order doctrine as a small, modest, narrow, selective exception to the final-judgment rule.

That's especially true here, in the context of a collateral-order appeal of a denial of qualified immunity, where the Court has explicitly held that interlocutory appellate jurisdiction is "limited." *Johnson v. Jones*, 515

U.S. 304, 313, 317 (1995). But before turning to that decision, a word on qualified immunity—itself a flawed doctrine, whose flaws only compound when combined with collateral-order review. Those flaws merit independent scrutiny.

## 2. Qualified immunity was a mistake—an atextual, unworkable exception to Congress's civil-rights remedy.

### 2.1. Qualified immunity conflicts with the original text, history, and purpose of Section 1983.

Qualified immunity arose out of a scrivener's error. In *Pierson v. Ray*, the Supreme Court held that 42 U.S.C. § 1983 incorporated the Mississippi common-law defense of "good faith and probable cause." 386 U.S. 547, 556–57 (1967). It based its reasoning on the canon that statutes in derogation of the common law should be strictly construed. "[W]e presume," the Court explained, "that Congress would have specifically so provided had it wished to abolish [common-law immunities]." *Id*. at 555; *see also Filarsky v. Delia*, 566 U.S. 377, 383–84 (2012) (reaffirming qualified immunity's common-law basis).

But the hidden premise is wrong: Congress *did* "specifically [ ] provide[ ]" that Section 1983 would abrogate common-law immunities. *Cf. Pierson*, 386 U.S. at 555. As enacted, Section 1983 included a crucial clause that its codified form omits:

> That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . . .

An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes, ch. 22, § 1, 17 Stat. 13 (1871).  With the italicized words, "the 1871 Congress created liability for state actors who violate federal law, *notwithstanding* any state law to the contrary."  Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 235 (2023).  In short:  State common-law immunities have no place in the interpretation of Section 1983.

The codified version omitting that language arose not from any change of heart on Congress's part, but from a scrivener's error.  After the Civil War, Congress commissioned—and in 1874, enacted—a compilation of its statutes.  Margaret Wood, *The Revised Statutes of the United States: Predecessor to the U.S. Code*, Library of Congress Blogs (July 2, 2015).[7]  For unknown reasons—probably hostility to Reconstruction,

---

[7] https://blogs.loc.gov/law/2015/07/the-revised-statutes-of-the-united-states-predecessor-to-the-u-s-code/.

which by 1874 was reaching fever pitch—the Reviser omitted the crucial "notwithstanding" clause of Section 1983.[8]  *See* Reinert, 111 Cal. L. Rev. at 237–38.  In fact, the Revised Statutes of 1874 contained so many errors and omissions that Congress had to publish a new revision just four years later.  Will Tress, *Lost Laws: What We Can't Find in the U.S. Code*, 40 Golden Gate U.L. Rev. 129, 135–36 (2010).  This time, Congress learned from its mistake and didn't enact the new revision into positive law.  *Id*.  But that left the 1874 revision of Section 1983—the *mistaken* 1874 revision—as the last word on the books.  Reinert, 111 Cal. L. Rev. at 237–38.  And thus *Pierson*'s mistaken premise.

The original text of Section 1983 is hardly qualified immunity's only problem.  At least four others are worth mentioning.

First, the anti-derogation canon that *Pierson* purported to apply has itself been deprecated.  It's a "relic," in Justice Scalia's words, of the courts' historical hostility to statutory law.  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 108 (2012).  And it's an especially tenuous basis for importing immunity into Section 1983, a broad remedial statute enacted by the Reconstruction Congress to "interpose the federal courts between the States and the people."  *See Mitchum v. Foster*, 407 U.S. 225, 238–42 (1972).

---

[8] For ease of reference, this brief consistently refers to this provision as "Section 1983," even though, formally, the statute that gives Section 1983 legal force today is Section 1979 of the Revised Statutes of 1874.

Second, if qualified immunity comes from "the background of tort liability," it should apply only to false-arrest type claims, or at most to Fourth Amendment claims generally. *See Pierson*, 386 U.S. at 556–57. There's no basis for it to apply—as the Court has applied it—to all executive action. *Compare id. with Scheuer v. Rhodes*, 416 U.S. 232, 247–48 (1974); *see* William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 53 (2018).

Third, the good-faith defense on which qualified immunity was supposedly based depended on the officer's *subjective* state of mind—as "good faith" might suggest. But the Court has abrogated any subjective component and instead transmogrified qualified immunity into an *objective* inquiry into the content of "clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As a result, a nineteenth-century lawyer familiar with that era's common-law defenses would find today's doctrine unrecognizable. And if it's neither stated in the statute nor a creature of the common law, then qualified immunity is just more "freewheeling judicial policymaking." *Dobbs*, 597 U.S. at 240.

Finally, no survey of qualified immunity's flaws would be complete without some discussion of its perverse outcomes. In this Court alone,

11

plaintiffs have lost their civil-rights claims for lack of "clearly established" law:

- that the Fourth Amendment forbids police officers to steal hundreds of thousands of dollars in seized cash; *Jessop v. City of Fresno*, 936 F.3d 937, 940–42 (9th Cir. 2019);

- that an inmate has a constitutional right to confidential communications with his lawyer, *Evans v. Skolnik*, 997 F.3d 1060, 1067–69 (9th Cir. 2021); and

- that consent to enter a home using a key, freely given, does not also give officers leave to destroy the home, *West v. City of Caldwell*, 931 F.3d 978, 984–87 (9th Cir. 2019).

Worse yet: because courts can bypass the constitutional question entirely, none of those cases "clearly established" the law either, leaving the next officer free to do exactly the same thing and again escape liability. *See Jessop*, 936 F.3d at 940; *West*, 931 F.3d at 983; *Evans*, 997 F.3d at 1069–70.

## 2.2.  Qualified immunity has been roundly criticized.

As a result of all these shortcomings, qualified immunity has come in for criticism from jurists at all levels and scholars of all stripes.

Start with the Supreme Court:  Members both past and present have criticized the modern state of qualified immunity.  Many years ago, Justice Scalia pointed out that the doctrine was not "faithful to the

common-law immunities that existed when § 1983 was enacted." *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting). Justice Kennedy also complained that qualified immunity had "diverged to a substantial degree from the historical standards." *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring). More recently, Justice Thomas has also concluded that the current doctrine "stray[s] from the statutory text" of Section 1983—and has repeatedly called for overruling it outright. *Baxter v. Bracey*, 140 S. Ct. 1862, 1862 (2020) (Thomas, J., dissenting from denial of certiorari); *see also Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (statement of Thomas, J.); *Ziglar v. Abbasi*, 582 U.S. 120, 160 (2017) (opinion of Thomas, J.).

Other Justices have criticized the doctrine's practical outcomes. When he was a circuit judge, Justice Gorsuch explained that "sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (Gorsuch, J.). And Justice Sotomayor has objected that the Court's application of the doctrine has yielded "nothing right or just under the law." *Kisela v. Hughes*, 584 U.S. 100, 121 (2018) (Sotomayor, J., dissenting).

Meanwhile, in this Court, Judge Hurwitz has criticized qualified immunity as a "judge-made doctrine" found "nowhere in the text of § 1983." *Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012, 1025 (9th Cir. 2020) (Hurwitz, J., concurring in part and dissenting in part). In the

13

Fifth Circuit, Judge Willett has written that "qualified immunity smacks of unqualified impunity." *Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., concurring in part, dissenting in part).  In fact, judges in nearly every federal court of appeals have reached similar conclusions. *See, e.g.*, *McKinney v. City of Middletown*, 49 F.4th 730, 756 (2d Cir. 2022) (Calabresi, J., dissenting) ("[T]he doctrine of qualified immunity—misbegotten and misguided—should go.").[9]  So have scholars and advocacy organizations of every ideological persuasion.  Reinert, 111 Cal. L. Rev. at 203 n.1 (collecting sources).

### 2.3. The Supreme Court has begun trimming the doctrine's harshest excesses.

All this criticism has had an effect.  Before 2020, the Court hadn't reversed a lower court for granting qualified immunity since *Groh v. Ramirez*, 540 U.S. 551, 563 (2004).  But in recent years it's done so several times.

---

[9] *See also, e.g.*, *Justiniano v. Walker*, 986 F.3d 11, 14–15 & n.1 (1st Cir. 2021) (citing *Jamison v. McClendon*, 476 F. Supp. 3d 386, 390–92 (S.D. Miss. 2020)); *Jefferson v. Lias*, 21 F.4th 74, 87, 93–94 (3d Cir. 2021) (McKee, J., joined by Restrepo & Fuentes, JJ., concurring); *R.A. v. Johnson*, 36 F.4th 537, 547 n.2 (4th Cir. 2022) (Motz, J., concurring); *Reich v. City of Elizabethtown*, 945 F.3d 968, 989 n.1 (6th Cir. 2019) (Moore, J., dissenting); *Thompson v. Cope*, 900 F.3d 414, 421 n.1 (7th Cir. 2018); *Goffin v. Ashcraft*, 977 F.3d 687, 694 n.5 (8th Cir. 2020) (Smith, J., concurring); *Cox v. Wilson*, 971 F.3d 1159, 1165 (10th Cir. 2020) (Lucero, J., joined by Phillips, J., dissenting from denial of rehearing en banc); *Schantz v. DeLoach*, 2021 WL 4977514, at *12 (11th Cir. 2021) (Jordan, J., concurring).

14

The Court began changing course in *Taylor v. Riojas*, in which it held that confining a prisoner in "shockingly unsanitary cells" for several days obviously violated the Constitution, even without an earlier case saying so. 592 U.S. 7, 7–8 (2020). A few months later, in *McCoy v. Alamu*, the Court ordered the Fifth Circuit to reconsider its grant of qualified immunity to a prison guard who had gratuitously assaulted an inmate. *McCoy v. Alamu*, 141 S. Ct. 1364 (2021) (mem.), *vacating* 950 F.3d 226, 232 (5th Cir. 2020). And just last year, the Court instructed the Fifth Circuit to revisit another case, *Villarreal v. Alaniz*, in which that court had granted immunity to officers who arrested a citizen journalist for her reporting. 145 S. Ct. 368 (2024) (mem.), *vacating Villarreal v. City of Laredo*, 94 F.4th 374 (5th Cir. 2024).

Assessing these decisions, the Fifth Circuit's Judge Willett has concluded that "the Court seems determined to dial back [qualified immunity's] harshest excesses." *Ramirez v. Guadarrama*, 2 F.4th 506, 522 (5th Cir. 2021) (Willett, J., dissenting from denial of reh'g en banc). Other jurists, too, have concluded that *Taylor* and *McCoy* herald a change in jurisprudential heading. *See, e.g.*, *Truman v. Orem City*, 1 F.4th 1227, 1240 (10th Cir. 2021); *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 660 (6th Cir. 2021); *Cope v. Cogdill*, 3 F.4th 198, 220 (5th Cir. 2021) (Dennis, J., dissenting); *Rico v. Ducart*, 980 F.3d 1292, 1307 (9th Cir. 2020) (Silver, J., concurring in part).

15

And there's more. Courts are also beginning to distinguish between "split-second" decisions made in the heat of the moment and "deliberate and considered" decisions made in the calm of an office. *Wearry v. Foster*, 52 F.4th 258, 259 (5th Cir. 2022) (Ho, J., concurring in denial of reh'g en banc). Justice Thomas, for instance, has suggested that "calculated choices about enacting or enforcing unconstitutional policies" should receive less protection under qualified immunity than "split-second decision[s] to use force in a dangerous setting." *Hoggard*, 141 S. Ct. at 2422 (statement of Thomas, J.). Or as Judge Ho of the Fifth Circuit put it, when an official makes a "deliberate and considered decision to trample on a citizen's constitutional rights," he "deserve[s] to be held accountable." *Wearry*, 52 F.4th at 259 (Ho, J., concurring); *accord Finley v. Huss*, 102 F.4th 789, 810 (6th Cir. 2024); *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 867 (8th Cir. 2021); *Reedy v. Evanson*, 615 F.3d 197, 224 n.37 (3d Cir. 2010).

Simply put, qualified immunity is in the middle of a sea change toward less immunity and more accountability. That sea change should be reflected in this Court's disposition of this appeal.

16

### 3. Combining the collateral-order doctrine with qualified immunity compounded the flaws of both, so the Supreme Court has since sharply limited such appeals.

#### 3.1. Allowing collateral-order review of qualified-immunity denials flooded the courts with appeals like this one.

In the mid-1980s, the collateral-order doctrine was at its peak—and qualified immunity was still a new doctrine whose implementation might need closer appellate supervision. So in *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the Supreme Court extended the former to include the latter. Almost immediately, the courts of appeals saw an explosion in interlocutory appeals of qualified-immunity denials. Ten years in, the Court began to backpedal. Today, such appeals are still allowed—but their scope has been sharply limited.

The story starts with *Mitchell*. Just as *Cohen* mangled the final-judgment rule, *Mitchell* mangled *Cohen*'s rules. A collateral order must be "conclusive[ ]," *Coopers*, 437 U.S. at 468, but a defendant can assert qualified immunity on the pleadings, in multiple summary-judgment motions, during trial in a motion for judgment as a matter of law, *and again* at the end of trial. A collateral order must be "completely separate" from the merits, *Coopers*, 437 U.S. at 468, but qualified immunity's two-step inquiry *incorporates* the merits question of whether the officer violated a constitutional right. *Ashcroft*, 556 U.S. at 672–75, 680. And a collateral

order must be "effectively unreviewable" after final judgment, *Coopers*, 437 U.S. at 468, but if a court of appeals concludes an officer should've gotten qualified immunity, it can simply vacate any damages award and grant complete relief. *E.g.*, *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115–16, 1118 (9th Cir. 2017). So denials of qualified immunity meet *none* of *Cohen*'s requirements.

Even so, the *Mitchell* Court allowed disappointed officer-defendants to seek interlocutory review. 472 U.S. at 530. That decision kindled an explosion of "purely procedural litigation." *See* Judicial Conference of the United States, *Report of the Federal Courts Study Committee* 95 (1990).[10] The effect was immediate: Only three years later, this Court was already lamenting that "government defendants apparently now deem it mandatory to bring these appeals from any adverse ruling, no matter how clearly correct the trial court's decision." *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1210 (9th Cir. 1988). And these appeals don't just clog appellate dockets—they also needlessly delay justice for civil-rights plaintiffs.

---

[10] The Judicial Conference didn't call *Mitchell* out by name—it just observed, somewhat obliquely, that the law of finality under Section 1291 "strikes many observers as unsatisfactory in several respects," "especially the 'collateral order' rule." *Id*. But given the timing—more than four decades after *Cohen*, yet only five years after *Mitchell*—the implication is hard to miss.

### 3.2. In response, the Supreme Court limited such appeals to cases presenting "neat abstract issues of law."

After ten years of abuse, the Supreme Court finally stepped in, limiting interlocutory appeals to cases presenting "neat abstract issues of law." *Johnson*, 515 U.S. at 317 (quoting 15A Charles Alan Wright et al., *Federal Practice & Procedure* § 3914.10, p.664 (2d ed. 1992)). So a court of appeals can still hear an interlocutory appeal of a denial of qualified immunity—but only "to the extent that it turns on an issue of law." *Villanueva v. California*, 986 F.3d 1158, 1164 (9th Cir. 2021) (quotation marks omitted). In other words, to invoke appellate jurisdiction, officer-defendants must thread a jurisdictional needle: "[P]urely legal" issues get through; issues of fact do not. *Johnson*, 515 U.S. at 313.

At the pleading stage, this limitation reduces to the ordinary Rule 12(b)(6) standard: The court of appeals must assume the plaintiff's allegations are true and determine whether the defendants' conduct, as alleged, violated clearly established law. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018).

But at the summary-judgment stage, threading the needle is not so simple: What gets through depends on the difference between "genuineness" and "materiality." *George v. Morris*, 736 F.3d 829, 834–35 (9th Cir. 2013). When a district court denies summary judgment, it necessarily decides that the parties' evidence presents at least one "genuine dispute as to a[] material fact." Fed. R. Civ. P. 56(a). A dispute is "genuine" if

19

"there is enough evidence in the record for a jury to conclude that certain facts [that the movant denies] are true." *George*, 736 F.3d at 835 (quotation marks omitted). A dispute is "material" if, under the governing law, changing the outcome of the dispute would change the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

So genuineness is an evidentiary question and materiality is a legal question. From that distinction flows the jurisdictional rule: A court of appeals hearing an interlocutory appeal from a denial of summary judgment has jurisdiction to review whether the disputes identified by the district court are legally material, but not whether they are evidentiarily genuine. *George*, 736 F.3d at 834–35; *Johnson*, 515 U.S. at 307, 313.

*George* illustrates this rule in action. Sheriff's deputies killed an old man on his back patio. 736 F.3d at 832. They claimed he had raised his gun and pointed it directly at them. *Id.* at 833 n.4. But the district court held that a jury could reasonably disbelieve their story, so it denied summary judgment. *Id.* at 835. On appeal, this Court limited its review to whether, *if* the deputies had lacked "objective provocation" when they shot the man, they had used excessive force. *Id.* at 838–39. That is, the Court accepted the district court's view of the facts and decided only the "purely legal" question of whether the deputies were entitled to qualified immunity under those facts. *Johnson*, 515 U.S. at 313; *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). It rejected the deputies' (and the dissent's)

20

invitation to review "the sufficiency of [the plaintiff's] evidence." *George*, 736 F.3d at 834.

Other cases are similar. In *Pauluk v. Savage*, this Court declined to review the appellants' arguments that the record contained "insufficient evidence" to create a genuine dispute of material fact. 836 F.3d 1117, 1121 (9th Cir. 2016). Likewise, in *Isayeva v. Sacramento Sheriff's Department*, this Court explained that it "must accept" the district court's finding that "factual disputes are genuine and supported by the record." 872 F.3d 938, 945, 947 (9th Cir. 2017). It resolved those disputes in favor of the plaintiff and applied the law to that factual universe. *Id*. at 948.

In short, appellate courts performing interlocutory review "simply take, as given, the facts that the district court assumed when it denied summary judgment." *Johnson*, 515 U.S. at 319. They do not conduct exacting "scrutin[y] of the record," because such determinations are simply "not reviewable on interlocutory appeal." *George*, 736 F.3d at 835; *Ames v. King Cnty.*, 846 F.3d 340, 347 (9th Cir. 2017). When a district court finds that a nonmoving party has presented enough evidence to dispute a point of fact, the court of appeals "categorically" lacks jurisdiction to reach a different conclusion. *George*, 736 F.3d at 834 (quotation marks omitted).

### 3.3. When an official makes factbound arguments on interlocutory review, the proper course is to dismiss the appeal.

When an officer-appellant crosses these strict jurisdictional bounds—whether openly, by asking the Court to revisit factual conclusions, or covertly, by framing legal arguments that bake in their own view of the facts—the correct disposition is to dismiss the appeal for lack of jurisdiction. This Court does so often. *E.g.*, *Maropulos v. Cnty. of Los Angeles*, 560 F.3d 974, 975 (9th Cir. 2009) (dismissing the appeal because it raised "issues having to do with sufficiency of the evidence over which [the Court] lack[ed] jurisdiction") (per curiam); *Singh v. City of Phoenix*, 124 F.4th 746, 755–56 (9th Cir. 2024); *Peck v. Montoya*, 51 F.4th 877, 886 (9th Cir. 2022); *Shannon v. Jones*, 812 F. App'x 501, 502–03 (9th Cir. 2020); *NeSmith v. Olsen*, 808 F. App'x 442, 444 (9th Cir. 2020); *Maddox ex rel. D.M. v. City of Sandpoint*, 732 F. App'x 609, 610 (9th Cir. 2018); *Conatser v. N. Las Vegas Police Dep't*, 445 F. App'x 932, 933 (9th Cir. 2011).

At times, however, rather than dismiss, this Court has looked past an officer's fact-based arguments and reviewed the district court's decision based on factual premises the officer *should* have adopted. *E.g.*, *Pauluk*, 836 F.3d at 1121. That is error. Under the "principle of party presentation," courts normally decide "only questions presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) (quotation marks omitted). Any deviation from that rule must be "modest."

22

*Id*. at 376.  Assuming a factual basis not presented by the party pressing the appeal "scarcely fits that bill."  *Id*.  If an appellant offers only arguments the Court cannot hear, then the Court cannot hear the appellant's arguments—it's that simple.

In short, appellate jurisdiction turns on "the nature of the defendant's argument on appeal."  *Est. of Anderson v. Marsh*, 985 F.3d 726, 731–33 (9th Cir. 2021).  If the opening brief contains a "distinct legal claim," the Court may adjudicate it.  *George*, 736 F.3d at 837.  Otherwise, the Court should "decline to do [the] appellant's work"—and dismiss the interlocutory appeal instead.  *Id*. at 837 (quotation marks omitted).

## 4.  The officials' argument here depends on their view of the facts, so this Court should dismiss their appeal.

The officials' appeal here depends on one version of the facts.  In this account, the City decided to clear the homeless encampment out of Hawthorne Park.  OB 4–5.  As a necessary first step, it "close[d] the park to the general public"—allowing in only city employees and volunteers assisting them—because it feared that crime and unsanitary conditions caused by the homeless "posed a general threat to health and safety."  OB 26–27, 35–36.  To ensure media access, journalists were given a "media staging area" from which to report.  OB 8–9.  April Fonseca violated this arrangement, so she was arrested by officials "acting pursuant to" the eminently lawful "closure order and operation plan."  OB 31.

It's a nice story, but it should be told to a jury—not to a court of appeals sitting in the interlocutory posture. That's because the district court found that the jury might choose to believe a different story. This one starts the same way: The City decided to clear the homeless encampment, and to that end it closed the park. ER-6. But then the story diverges. In this version, the officers responsible for enforcing the closure sought to avoid public scrutiny: They didn't want reporters "follow[ing] us around[,] recording us all the time." ER-13 (quotation marks omitted). So in a "targeted attempt to prevent reporting on the clearance," they decided to exclude "reporters and observers" from the park. ER-14. And rather than document this decision in the written operations plan, they shared it in verbal conversations off the record. ER-7. On this account, the "health and safety concerns" the officers now cite for excluding reporters were a pretext, or perhaps a post hoc rationalization. ER-13. And the "media staging area"—located "outside the park," where reporters "could not hear or record police activity" inside the park—was nothing but a fig leaf. ER-7.

The qualified-immunity inquiry hinges crucially on which story jurors believe. On the former, maybe the officers get qualified immunity; on the latter, definitely not. Answering Brief at 55–63. But that decision—which story to believe—is the jury's to make. And since the officers present no argument for qualified immunity "distinct" from their telling of the facts, there's nothing for the Court to review. *Cf. George*, 736 F.3d

at 837; *see, e.g.*, *Maropulos*, 560 F.3d at 975; *Shannon*, 812 F. App'x at 502–03.  Their factbound arguments are barred, and the Court may not draft for them a "neat abstract issue[ ] of law" over which it might have jurisdiction instead.  *George*, 736 F.3d at 837; c*f. Johnson*, 515 U.S. at 317 (quotation marks omitted); *Sineneng-Smith*, 590 U.S. at 375–76.

Simply put, the officers have failed to present a single reviewable issue.  Their appeal should be dismissed.

## CONCLUSION

For all these reasons, this Court should dismiss the appeal for lack of jurisdiction.

Dated:  November 10, 2025     Respectfully submitted,

By:  /s/Athul K. Acharya
          Athul K. Acharya

PUBLIC ACCOUNTABILITY
Counsel for Amici Curiae

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-2618

I am the attorney or self-represented party.

**This brief contains** 5,779 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/Athul K. Acharya     **Date** [ ]

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                    *Rev. 12/01/22*